Donald v. State 



 IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 




NO. 3-91-561-CR





GORDON DONALD,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE


 




FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT



NO. 40,313, HONORABLE STANTON B. PEMBERTON, JUDGE PRESIDING



 





PER CURIAM



 A jury found appellant guilty of burglary of a habitation. Tex. Penal Code Ann.
§ 30.02 (1989). After finding that appellant had been previously convicted of a felony offense,
the trial court assessed punishment at imprisonment for forty years. On appeal, appellant
challenges the sufficiency of the evidence on the issues of identity and intent to commit aggravated
sexual assault, and he contests the admissibility of evidence of an extraneous sexual assault.

 In his first point of error, appellant asserts that no evidence exists to connect him
to the offense. The State relies on circumstantial evidence to prove that appellant committed the
offense. In reviewing the sufficiency of the evidence to support the conviction, we view the
evidence in the light most favorable to the prosecution to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 318-19 (1979); Griffin v. State, 614 S.W.2d 155, 159 (Tex. Crim. App.
1981). Because this case was tried after November 6, 1991, we need not determine whether the
evidence excludes every reasonable hypothesis other than appellant's guilt. Geesa v. State, 820
S.W.2d 154, 161 (Tex. Crim. App. 1991).

 The eight-year-old complainant, Nicole Peacock, testified that on the evening of
April 23, 1991, she and her sister stayed home alone while their mother went to visit their step-father. Each sister went to sleep in her own bedroom. During the night, Nicole awoke because
a person was pulling her panties down about half-way to her knees. Nicole was sleeping on her
stomach, and when she awoke, she was scared and turned away to face the wall. The person put
his hand on her mouth, and the hand felt soft, as though something were covering it. With both
her hands, Nicole pulled the hand down, and she screamed as loud as she could. When she
screamed, the person ran from her bedroom, down the hallway, and out the back kitchen door.

 As the person ran through the house, Nicole heard the sound tennis shoes make. 
The person had to run over wood floors and, in the kitchen, a "hard floor" to leave the house. 
She heard the back screen door open and close. Nicole's sister Melissa got up and took a knife
from the kitchen, and the two girls left the house to find their mother. Two houses away from
theirs on Arkansas Street they saw a policeman, who took them to the nearest house to stay and
then began searching for the intruder.

 Nicole's bedroom was dark but not pitch dark because the bathroom light was on
near her room. Nicole saw the person standing next to her bed, but could not see the face. The
reason she could not see the person's face was that something dark was covering it. She described
the figure as tall and skinny and said that the person was wearing dark clothing. In her statement
to the police, Nicole described the face covering as a "black covered sweater kind of thing." 
Nicole could tell neither if the person was male or female nor black or white.

 Nicole's thirteen-year-old sister, Melissa Figlow, testified that on April 23, 1991,
they went to bed at 10:00 p.m. Their mother was going to visit their stepfather at about
10:30 p.m., leaving the two girls alone. Before she left, their mother told Melissa that she had
locked all the windows and doors of the house. Melissa awoke later that night when Nicole
screamed. Melissa did not leave her bedroom at first, and while she was sitting in her bed, she
saw a man go out the back door. Melissa asked Nicole what was wrong, and Nicole said that a
man had come into her room.

 Although Melissa was not sure what time the man left her house, she stated that
it could have been between 2:00 and 4:00 a.m. Melissa put on a jacket, told Nicole to get
dressed, and got a kitchen knife for protection; she was hurrying to get out of the house because
she was scared. While she was in the kitchen, Melissa noticed that the window closest to the
kitchen door was open and that the top of the table standing beneath the window had mud on it. 
The backyard of their house had mud in it, not grass.

 On the way to their stepfather's house, Melissa saw a police officer. He asked why
they were out so late, and Melissa told him that a man was in their house trying to hurt her little
sister. The policeman asked the neighbor in the house he was standing by to watch the girls until
he could find the man.

 Melissa's bedroom led to the kitchen, so that from her room she could see the back
door. Melissa described the lighting in the house as dim, but adequate to see forms. The back
porch light was on, which allowed her to glimpse the man as he ran out the back door. The man
was tall and thin, and all his clothing was dark. She guessed that his height was 5' 10" or 11,"
but because his body was covered she did not know if he was black or white. Melissa thought
that some kind of cloth completely covered the man's head and face because when he ran out the
door, she could not see his face. The shade of this covering was very dark. The floor near
the back door was made of a wood and tile mixture, and as he ran, she heard the squeaks tennis
shoes make when someone wearing them runs around fast on linoleum. The back door was not
locked after the man left. 

 Officer Oliver Garner was on duty near the complainant's house on the morning
of April 24, 1991. He parked in an unmarked car in the 1300 block of Arkansas Street, and at
4:10 a.m., a black male dressed in dark clothing walked up along the passenger side of his car. 
The man jumped into the street, hit the right front fender of Garner's car, walked toward the
center of the street, turned completely around, and continued walking to the other side of the
street. When the individual turned around in the middle of the street, Garner began calling other
units in the area. The man stood five or six feet away from a house on the other side of the street
and looked in the front window for about five seconds. He tried to get closer to the window and
appeared to touch it; then he went to the front door. Suddenly, the man moved away from the
house, started running, and disappeared up a cross street. The man started to run away after
Garner had requested the units to approach; Garner suspected that the noise of the car engines
scared the person and made him run away. 

 The man Garner saw was wearing a long-sleeved shirt on his head with the sleeves
hanging down. He was thin, weighing 130 to 140 pounds, and about 5' 8" tall. All the man's
clothing looked dark, but his jacket looked lighter than the rest of his outfit. 

 Garner saw appellant later that night when he was arrested. Appellant's height,
weight, and race were consistent with the man Garner had observed earlier. Garner testified that
though he could not be positive, when he saw appellant after his arrest, he believed that appellant
was the same man he had earlier seen on Arkansas Street.

 Garner identified six photographs of appellant taken after his arrest. Five of the
photos showed appellant wearing a cloth that covered the top of his forehead and that draped the
back of his neck and both sides of his face, falling past his shoulders. Garner stated that the
photos accurately depicted appellant's appearance at the police station and that, based on the
clothing of the man in the photos, they represented the same man he had seen on Arkansas Street.

 Officer James Chapman was patrolling the complainant's neighborhood on foot
during the early morning of April 24, 1991. At about 4:00 a.m., Garner radioed him to say that
a black male had walked by his car. Chapman was just approaching an intersection one-half block
away from Garner's car, and he saw someone in dark clothing pass in front of the car. Chapman
headed toward Garner's car and saw the person walk to a house, then run back across the street
toward a side street. The man was about six feet tall; he was wearing white tennis shoes, dark
clothing including a dark jacket, and something on his head that hung down past his shoulders and
flopped in the wind. Chapman had not seen anyone else before this happened. 

 Chapman continued walking along Arkansas Street, and two or three houses past
the point from which he had first observed the man, he saw two small girls walking toward him. 
The girls were terrified, and one of them told him that a black man had just come into their house. 
Nicole said that the person was wearing dark clothing and had something over his head. Chapman
took the girls to the house at 1315 Arkansas Street, three houses away from their own, to stay
while he tried to find the person. 

 After leaving the girls, Chapman received a radio report that a suspicious person
had been seen in a neighbor's backyard. He walked two blocks south of Arkansas Street to
Illinois Street to investigate the call, found nothing, and went to check the girls' house at 1403
Arkansas. At the house, Chapman noticed splotches of mud on the wall beneath an open window
and inside the window sill. The splotches looked like somebody had tried to climb up to the
window and through it. Chapman talked to the girls and then returned to Illinois Street where the
suspicious person had been reported.

 Chapman approached a house in the 1400 block of Illinois Street where dogs were
barking; a car and a truck were parked in the driveway. As Chapman stood behind the truck, he
saw a black male crouched between the car and the house. The man was peering from side to side
and started to creep out from between the car and house. He was dressed in a dark-colored jacket
and jeans with something hooded over his head that hung down to his chest or waist. When a
marked patrol car passed by, the man jogged back between the car and house.

 Chapman shone his flashlight on the man and saw that he had on dark jeans, a
purple shirt, blue windbreaker, white tennis shoes, and over his head, a long-sleeved camouflage
T-shirt. The neck of the shirt was on top of his head so that the shirt hung down in back and the
sleeves hung down in front. Chapman identified this man as appellant. He recognized appellant
as the same man he had seen earlier on Arkansas Street. Chapman identified himself as a police
officer and ordered appellant to freeze. When appellant started to run, Chapman yelled that he
would shoot and illuminated his gun with the flashlight. Chapman told appellant to lie down, and
after appellant saw Chapman's weapon, he complied. Appellant tried to get up one more time,
but obeyed Chapman's command to lie back down.

 From the time Chapman first saw appellant on Arkansas Street to the time he
arrested him two blocks away on Illinois Street, about one-half hour passed.

 Officer Greg Holloway saw appellant at the police station after his arrest and took
the shoes appellant was wearing as evidence. At trial, Holloway identified a pair of Nike tennis
shoes as the shoes appellant had worn. The shoes at trial had dried mud caked in the soles, but
when Holloway took them from appellant after his arrest, the soles contained mud that had not
yet dried.

 Laudia Provencal lived near the complainant's house one block north of Arkansas
Street. At 4:30 a.m. on April 15, 1991, nine days before the offense involving Nicole Peacock,
appellant broke into her home and sexually assaulted her. During the assault appellant wore a
cloth on his head; the cloth was black and did not cover appellant's face, but hung down the sides
and back of his head.

 Before the assault, Provencal had made a poster and laid it on the floor of the room
where the assault occurred. Afterward, she noticed the print of a large tennis shoe on the poster
which had not been there earlier. She estimated the shoe print to be a man's size 10. The design
on the soles of the tennis shoes appellant wore at his arrest matched the shoe print on Provencal's
poster.

 Presence at the scene of an offense is one circumstance tending to connect a person
with the crime, and taken together with other facts may be sufficient to show that he is guilty. 
Thompson v. State, 563 S.W.2d 247 (Tex. Crim. App. 1978); e.g., Shivers v. State, 460 S.W.2d
915 (Tex. Crim. App. 1970). Melissa stated that the burglary of 1403 Arkansas Street could have
occurred between 2:00 and 4:00 a.m. At 4:10 a.m., Officer Garner saw a man at 1304 Arkansas
that he believed was appellant; Officer Chapman was positive that the man at 1304 Arkansas was
appellant. Chapman had observed no one else on the streets before seeing appellant. Melissa and
Nicole left quickly after the burglary occurred, and they met Officer Chapman two houses from
their house; when Chapman saw the girls, he had just walked two houses from the place he was
standing when he first saw appellant. Officer Chapman thus saw appellant shortly after the
burglary occurred on the same street as the burgled house. One-half hour after he first saw
appellant, Chapman arrested him two blocks south of the burgled house. 

 Appellant's clothing and physical characteristics also matched those of the man seen
at the girls' house. The man who entered 1403 Arkansas, as described by Melissa and Nicole,
was tall and thin, about 5' 10" or 11," wore dark clothing, and had a dark covering over his head
and face. Both girls heard the sound of tennis shoes when the man left the house. When he was
arrested, appellant was wearing tennis shoes, dark jeans, a purple shirt, and a blue windbreaker. 
Notably, he also wore a long-sleeved camouflage T-shirt over his head with the sleeves hanging
down in front. When Chapman saw appellant on Arkansas Street, he estimated appellant's height
at 6'; Garner described the man at Arkansas as 5'8" tall and thin, weighing 130 to 140 pounds.

 The backyard of Melissa and Nicole's house was muddy, and after the burglary,
mud was present on the wall beneath the open kitchen window, inside the window sill, and on the
table below the window. The tennis shoes appellant wore when arrested had fresh mud in the
soles.

 Evidence of flight from a police officer is also a circumstance from which guilt may
be inferred. Cantrell v. State, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987). After Chapman
identified himself as a police officer and ordered appellant to freeze, appellant began to run. 
Appellant tried to leave again after Chapman ordered him to lie down. Appellant ran from the
sight of a police car just before he was arrested on Illinois Street, and he was apparently
frightened away by the noise of approaching police cars while at 1304 Arkansas Street. 

 Further, appellant's suspicious behavior on both Arkansas Street and Illinois Street
is incriminating. Alto v. State, 739 S.W.2d 614 (Tex. App. 1987, pet ref'd). At 4:00 a.m.,
appellant peered into the window of a house on Arkansas Street and moved close to the door. 
Later, he crept from between a house and a car on Illinois Street, keeping a lookout and hiding
when a police car approached. 

 Finally, nine days before this offense, appellant sexually assaulted a woman in her
house one street north of Melissa's and Nicole's house. Appellant committed this assault at a
similar time of day, and he wore tennis shoes and a covering that veiled the back and sides of his
head. 

 No single circumstance of this case is sufficient to prove that appellant committed
the offense. However, the circumstances of appellant's presence near in place and time to the
offense, distinctive head covering, physical characteristics matching those of the burglar, muddy
shoes, suspicious behavior, and prior sexual assault of Provencal combine to support the verdict. 
Viewing the evidence as a whole and in the light most favorable to the verdict, we conclude that
a rational jury could have found beyond a reasonable doubt that appellant committed the offense. 
We overrule point one.

 In point of error two, appellant argues that the trial court erred in refusing to grant
his motion for mistrial. Appellant moved for a mistrial in response to certain testimony of Officer
Chapman; appellant admits, however, that the trial court never ruled on his motion. In the
absence of an adverse ruling, nothing is presented for review. Tex. R. App. P. Ann. 52(a)
(Pamph. 1992); Evans v. State, 622 S.W.2d 866 (Tex. Crim. App. 1981). We overrule point
two.

 In point of error three, appellant argues that the trial court erred in admitting the
testimony of Laudia Provencal. Appellant contends that because her testimony showed that he
committed an extraneous offense, it was irrelevant and prejudicial. Provencal testified that
appellant broke into her home at 4:30 a.m. on April 15, 1991, and sexually assaulted her. She
stated that appellant pushed her, hit her twice in the face, and threw her on the bed before he
sexually assaulted her. Appellant left after one-half hour because Provencal's babies were crying. 
Provencal described the head covering appellant wore and the shoeprint he left on her poster.

 Evidence of other offenses is admissible if it is relevant to proving a material issue
other than a defendant's character; permissible purposes to which extraneous-offense evidence
may be put include proving intent and identity. Tex. R. Crim. Evid. Ann. 404(b); (1) Plante v.
State, 692 S.W.2d 487, 491 (Tex. Crim. App. 1985); Albrecht v. State, 486 S.W.2d 97, 100
(Tex. Crim. App. 1972). Evidence is relevant if it tends to make the existence of a fact of
consequence to determining the action more or less probable than it would be without the
evidence. Rule 401. Even relevant evidence may be excluded, however, if the danger of unfair
prejudice outweighs its probative value. Rule 403. We consider first the relevance of Provencal's
testimony to material issues in the case. 

 Intent was a material issue at trial. It was an essential element in the State's proof
because the indictment alleged that when appellant entered Nicole Peacock's house, he intended
to commit aggravated sexual assault and indecency with a child. In addition, appellant's intent
to commit either aggravated sexual assault or indecency with a child could not be inferred from
the act of entry itself. Morgan v. State, 692 S.W.2d 877, 880 (Tex. Crim. App. 1985);
McCarron v. State, 605 S.W.2d 589, 593 (Tex. Crim. App. 1980).

 In determining the relevance of the extraneous offense to appellant's intent on
entering Nicole Peacock's house, the similarity of the two acts is important. Evidence that a prior
similar act was committed is useful because it reduces the possibility that the act in question was
done with innocent intent. Plante, 692 S.W.2d at 492. Provencal clearly identified appellant as
the perpetrator of the extraneous sexual assault. The extraneous assault and this offense occurred
at the same time of day, in the same neighborhood, and within a fortnight of each other. In both
cases, a male broke into a home, imposed or tried to impose his will by physical force, and
escaped when noise threatened to alert others. The extraneous offense was sufficiently similar to
the charged offense to make it more likely that when appellant entered Nicole Peacock's house,
he intended to commit either aggravated sexual assault or indecency with a child. Provencal's
testimony was therefore relevant to appellant's intent.

 Identity was also a material issue in this case: neither Melissa nor Nicole had seen
the intruder's face, rendering the sole evidence of the intruder's identity circumstantial. Albrecht
v. State, 486 S.W.2d at 100.

 The relevance of the assault on Provencal to the issue of the intruder's identity
depended on the State's showing that in both cases a characteristic method so distinctive as to be
like a signature was used. Messenger v. State, 638 S.W.2d 883, 886 (Tex. Crim. App. 1982). 
In addition to the similarities described above, Provencal's testimony showed similarities in the
dress of appellant on April 15 and of the intruder on April 24: she showed that appellant and the
intruder wore the same type of shoes, and more importantly, her description of the distinctive
head covering appellant wore on April 15 matched the type of head covering the perpetrator wore
in this case. Because these similarities were so distinctive as to show appellant's signature,
Provencal's testimony was relevant to the issue of identity.

 We next determine whether the danger of unfair prejudice substantially outweighs
the probative value of Provencal's testimony. Rule 403; Montgomery v. State, 810 S.W.2d 372,
391 (Tex. Crim. App. 1990) (opinion on rehearing). Rule 403 favors admissibility of relevant
evidence, and the presumption is that relevant evidence will be more probative than prejudicial. 
Montgomery v. State, 810 S.W.2d at 389. The lack of direct evidence available to prove either
the perpetrator's identity or his intent shows the State's need for the extraneous-offense evidence. 
The State did not devote a disproportionately large amount of time to questioning Provencal, and
it did not try to brand appellant as a criminal generally. The trial court instructed the jury to
consider evidence of extraneous offenses only to determine identity and intent. In its argument,
the State emphasized the limited purpose of Provencal's testimony and urged the jury to consider
its logical bearing on the two issues. The nature of the extraneous offense was not so
inflammatory that the trial court's limiting instruction would not likely be effective. Taken
together, these facts support the trial court's decision that the danger of unfair prejudice did not
substantially outweigh the probative value of the evidence. Because the trial court did not abuse
its discretion in admitting Provencal's testimony, we overrule point three.

 In point of error four, appellant argues that the trial court erred in submitting a
charge which allowed the jury to find that he intended to commit either indecency with a child or
aggravated sexual assault. See Tex. Penal Code Ann. §§ 21.11, .021 (1989). Appellant objected
at trial and maintains on appeal that the evidence was insufficient to prove that he intended to
commit aggravated sexual assault. 

 The evidence showed that appellant entered Nicole's bedroom at about 4:00 a.m.,
and while she was sleeping, pulled her panties down. When Nicole awoke and turned away from
him in fear, appellant forcefully tried to stop her from alerting anyone else in the house. 
Appellant ran outside after Nicole managed to scream. He was dressed in dark clothes and used
a covering to conceal his face. In addition, appellant had sexually assaulted Laudia Provencal nine
days earlier. From this evidence, a rational trier of fact could have found that when he entered
Nicole Peacock's house, appellant intended to commit aggravated sexual assault. See, e.g.,
Morrow v. State, 396 S.W.2d 386 (Tex. Crim. App. 1985) (opinion on rehearing); Moone v.
State, 802 S.W.2d 101 (Tex. App. 1990, pet. ref'd); Williams v. State, 699 S.W.2d 368 (Tex.
App. 1985, no pet.). We overrule point four.

 The judgment of conviction is affirmed.


[Before Chief Justice Carroll, Justices Aboussie and B. A. Smith]

Affirmed

Filed: June 10, 1992

[Do Not Publish]
1. [1] All further references to rules denote Tex. R. Crim. Evid. Ann. (Pamph. 1992).