In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-145 CR


____________________



KEVIN LEE ALLEN, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 411th District Court


Polk County, Texas


Trial Cause No. 18,371






OPINION


 A jury convicted Kevin Lee Allen of stalking. The trial court assessed a nine year
sentence as punishment. In three appellate issues, Allen challenges the legal and factual
sufficiency of the evidence supporting the verdict and argues the trial court reversibly erred
in admitting evidence of extraneous acts during the guilt phase of the trial. We affirm.

 A legal sufficiency review requires us to view the evidence in the light most favorable
to the verdict and determine whether any rational factfinder could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.
Crim. App. 2004). A factual sufficiency review requires that we consider all the evidence
in a neutral light to determine whether the evidence supporting the verdict is too weak to
support the finding of guilt beyond a reasonable doubt, or if the evidence of guilt, although
adequate if considered alone, is so greatly outweighed by contrary proof that the jury's
verdict is not rationally justified. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000);
see also Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).

 As defined in the Texas Penal Code, the offense of stalking includes both an objective
component and elements from the points of view of the accused and the complainant, as
follows:

 (a) A person commits an offense if the person, on more than one
occasion and pursuant to the same scheme or course of conduct that is directed
specifically at another person, knowingly engages in conduct, including
following the other person, that:


 (1) the actor knows or reasonably believes the other person will
regard as threatening:


 (A) bodily injury or death for the other person;


 (B) bodily injury or death for a member of the other person's
family or household; or


 (C) that an offense will be committed against the other person's
property;

 (2) causes the other person or a member of the other person's family or
household to be placed in fear of bodily injury or death or fear that an offense
will be committed against the other person's property; and


 (3) would cause a reasonable person to fear:


 (A) bodily injury or death for himself or herself;


 (B) bodily injury or death for a member of the person's family
or household; or


 (C) that an offense will be committed against the person's
property.


Tex. Pen. Code Ann. § 42.072 (Vernon 2003).


 Allen and the complainant developed a pattern of separation and reconciliation during
their rather short-lived romantic relationship. They began dating New Years' Eve, 2004;
shortly thereafter Allen moved in with the complainant. By April they were fighting,
separating, and reconciling. According to Allen, the complainant occasionally called him
and answered his telephone calls, thus encouraging him to call more frequently. Allen called
her hundreds of times from July 1 through July 4 of 2005. Complainant spent the night of
July 4 with Allen at his parents' house. Allen was arrested July 10. We understand Allen's
argument to be a challenge to the sufficiency of the evidence supporting a finding that Allen
knew the complainant would regard his conduct as threatening bodily injury or death. See
Tex. Pen. Code Ann. § 42.072(a)(1).

 Viewed in isolation, the victim's apparent willingness to be with Allen for an
extended period of time might call into question her fear of bodily injury and the appellant's
awareness of that fear. In the context of their relationship, however, the jury could
reasonably believe that the victim spent the Fourth of July with Allen precisely because she 
feared him, that the appellant made the calls for the purpose of intimidating the victim into
staying with him, and that the appellant's conduct included a threat of bodily injury to the
complainant.

 There is ample evidence that Allen engaged in a scheme or course of conduct. A
telephone company representative produced records of the telephone calls made on a
telephone in Allen's possession from July 1 through July 12, 2005. Although the telephone
was registered to the appellant's father, Allen had exclusive use of the telephone. The victim
identified her telephone number and literally hundreds of calls to that number over the space
of a few days. According to the complainant, she kept her phone turned on but most of the
calls went to her voicemail. The only lull in this activity was when they were visiting Allen's
parents on July 4. The complainant testified that she insisted they go there instead of her
home because she knew Allen would behave around his parents, and that made her feel safer. 
On July 6, Allen and the complainant argued about his having placed a pornography
subscription on her television account. She left, but they continued to call each other. 
During that period of time, Allen would sit outside her home, uninvited. The complainant
testified that she would call him because she was out with some friends and wanted to know
where he was "so I wasn't caught in a situation."

 In the early morning hours of July 10, the complainant encountered a law enforcement
officer at a restaurant. The officer noticed the constant telephone calls and asked her if she
would like to stop them. The officer spoke with Allen, and then advised the complainant not
to go home. She went to the sheriff's department. Allen called her several more times. The
complainant answered the phone and warned him to stop calling. After leaving the sheriff's
department, she realized Allen was driving very closely in the vehicle directly behind her. 
She drove to a friend's house, got out, and ran to the front steps. Allen caught her, threw her
to the ground, and took her cell phone. She called the police, who took Allen into custody.
The complainant obtained a protective order. Allen called her three times from the jail. She
was with the sheriff when Allen called, and the telephone calls stopped after that; however,
Allen started writing a series of letters while in custody.

 The officer who spoke with Allen from the restaurant testified that Allen reacted
belligerently to the suggestion that he stop calling the victim. According to the officer, Allen
screamed and cursed, and also implied that his position, as a former deputy and as the son
of a captain in the sheriff's department, would insulate him from negative consequences for
his actions. The officer testified about telling Allen that he had been warned and he needed
to leave the complainant alone. A short time later, Allen called the complainant again. 
When the appellant was arrested three hours later, he told the arresting officer repeatedly that
he loved the complainant and he could not leave her alone.

 The record contains evidence of physical violence that preceded and accompanied the
pattern of telephone calls from which the jury could infer both objective and subjective
awareness of a threat of bodily injury. The victim testified that Allen physically assaulted
her on five separate occasions. The first assault occurred in April at her home, after an
argument over mowing the lawn. Allen kicked her car, denting it, threw her keys across the
parking lot, took her cell phone, and hit a picture on her wall.

 The second assault occurred at an Onalaska club in May. Allen became jealous while
they were out on a date. Allen followed her into the ladies' bathroom, crushed her phone,
followed her outside, and pushed her against the wall. She hit him, and he slapped her face. 
The third incident occurred at his sister's estranged husband's home in June, after an
argument over the car keys. Allen hit the complainant across the face and hit her phone
while she was making a call, then choked her. Although Allen's sister admitted an argument
took place, Allen's sister and brother-in-law testified that no physical altercation took place
in their presence. Later that month, Allen assaulted the complainant in her home, tore her
telephones out of the wall, and punched a hole in the wall. Allen told her he was looking for
a knife and stated he wanted to kill himself. She started to run out the door, but he grabbed
her and threw her on the couch.

 The final assault occurred on July 10 when Allen threw her to the ground outside a
friend's home. According to the victim, "[t]he more the incidents occurred, the more I was
- I felt like I was scared, you know, because it wouldn't stop no matter what." She claimed
to have stayed with Allen as long as she did because he would be contrite once he calmed
down. She testified, "As long as I would be nice to him and he knew that I was there and he
had control, he was fine." She also testified that he would call her "[e]very day, sometimes
every minute." If she "made everything okay" with him, "[t]he phone calls would stop." The
victim denied the possibility that Allen was "getting mixed signals" from her behavior. 
Asked if he was threatening her, or merely trying to get her back, she replied, "He was
threatening me." The victim's co-worker confirmed that the victim was "scared of [Allen]"
during the periods of estrangement.

 The evidence on which Allen relies centers on the victim's behavior. The
complainant admitted that she both telephoned Allen and stayed with him while he was
stalking her. The jury could rationally construe the victim's behavior as a defensive response
to being stalked. Defense counsel argued to the jury that telephone messages for the
complainant did not contain overt threats of bodily injury. However, the jury could also
rationally conclude that Allen's behavior, which persisted after a police officer warned him
to stop, revealed a subjective awareness that his actions had placed the complainant in fear
of bodily injury. Furthermore, the jury could rationally find that a reasonable person in the
position of the complainant would be in fear of bodily injury or death. Although some of the
victim's behavior is arguably an illogical response to a threat, and witnesses for the appellant
controverted the victim's account of one of the incidents, the evidence supporting the verdict
is not so weak as to undermine our confidence in the verdict. Issues one and two are
overruled.

 In issue three, Allen contends the trial court erred in admitting evidence of extraneous
acts in the guilt phase of the trial. See Tex. R. Evid. 404(b). Allen's sister, Stacy Caldwell,
testified for the defense in the guilt phase of the trial. On direct, Caldwell denied that any
of the physical violence described by the victim during the State's case-in-chief had actually
occurred during the alleged assault in June. On cross-examination, Caldwell admitted that
she had called the complainant on July 10 and asked her to give Allen another chance. The
prosecutor asked, "[w]ell, if he [Allen] had not done anything wrong, what purpose would
there be in asking her to give him another chance . . . ?" The witness replied, "What else is
there to do? I wanted my brother - my brother is a good person. He deserves to be with his
son and his family." After a brief hearing outside the presence of the jury, the trial court
permitted the State to ask the witness if she was aware that Allen had been charged with
public intoxication after the altercation at the club in Onalaska; if she was aware that in July
2003, Allen assaulted his wife, destroyed a radio in her patrol vehicle and damaged property
in their home; and if she was aware that Allen faced criminal charges after the altercation
with his former wife resulted in the issuance of a family violence protective order, which he
violated three days later. (1)

 Allen contends the trial court abused its discretion because the witness was testifying
on cross-examination. Thus, he argues, the State relied upon its own questioning to elicit
extraneous act evidence. The State may not convert a fact witness into a character witness
through its own cross-examination. Wheeler v. State, 67 S.W.3d 879, 883 (Tex. Crim. App.
2002). Here, however, the State did not inquire into collateral matters or inject character into
the case. The prosecutor merely asked the witness why she had asked the victim to give the
appellant another chance if, as the witness claimed, the appellant had not done anything
wrong. This question neither inquired into extraneous acts nor asked about the character of
the accused, and defense counsel did not object to the scope of the question. If a defense
witness injects character in a non-responsive answer to a valid question on cross-examination, the State's remedy is to object and obtain an instruction to disregard the non-responsive answer. Wiggins v. State, 778 S.W.2d 877, 891 (Tex. App.--Dallas 1989, pet.
ref'd). In this case, however, the witness's answer - that she interceded for her brother
because he was a good person - was responsive to the question that had been asked. 
Therefore, the trial court properly overruled defense counsel's objection that the answer was
non-responsive.

 If a witness testifies to a defendant's good character, the State may inquire about the
witness's awareness of specific instances of conduct in its cross-examination. Drone v. State,
906 S.W.2d 608, 616 (Tex. App.--Austin 1995, pet. ref'd). Defense counsel did not object
when the prosecutor asked Caldwell if she was aware that appellant was charged with public
intoxication after the Onalaska bar fight. Indeed, the complainant had already testified
without objection that the police were called out to the scene, that she and Allen were taken
to the police station, and that Allen "got a PI" but that no assault charges were filed. Because
that incident was one of the assaults the State relied on to prove a threatening course of
conduct, the charges stemming from that incident would be admissible same transaction
contextual evidence. See Pondexter v. State, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996).

 Defense counsel, however, objected to the prosecutor's questions regarding the
witness's awareness of the appellant's violation of a protective order and assault against his
wife, on grounds of relevance and extraneousness. See Tex. R. Evid. 401, 402, 404. At that
point, however, this evidence was relevant to the issue of the defendant's good character. 
See Tex. R. Evid. 405. The State was entitled to test the witness's claim that she contacted
the victim because she knew Allen was a man of good character and not because as an
eyewitness to one of the assaults she knew her brother had committed a crime. Defense
counsel did not object that the evidence was more prejudicial than probative. See Tex. R.
Evid. 403.

 The State cannot develop through cross-examination a collateral matter that it could
not raise on direct. Shipman v. State, 604 S.W.2d 182, 183-84 (Tex. Crim. App. 1980). In
this case, Allen's defense relied on the theory that Allen failed to realize his conduct placed
the complainant in fear of serious bodily injury. In connection with this theory, defense
counsel asked the victim whether it was possible that Allen was "getting mixed signals" from
the calls she made to him to determine his location. Counsel argued to the jury that the
evidence did not show stalking, but only a breakup of a relationship that did not go smoothly. 
Counsel argued that Allen's phone calls and messages were not threats but mere pleas for the
complainant to continue their relationship, that the assaults were merely fights, and that the
victim did not become scared until after the protective order issued and Allen had been jailed. 
Allen's letter-writing campaign from the jail was, according to the defense, "after the fact"
and "not stalking." The evidence that similar behavior in his previous relationship had
resulted in a protective order and criminal charges was relevant to refute Allen's claim that
he was oblivious to the possibility that the object of his affections would perceive this sort
of attention as threats and be placed in fear. See Martin v. State, 173 S.W.3d 463, 465, 468
(Tex. Crim. App. 2005)("doctrine of chances" applied when consent was an issue in a
prosecution for sexual assault); Plante v. State, 692 S.W.2d 487, 490-92 (Tex. Crim. App.
1985)(similar extraneous conduct was relevant to prove intent in prosecution for theft by
deception). Because the State could have developed testimony regarding the extraneous acts
of conduct in its case-in-chief, the trial court did not err in permitting the State to develop this
testimony in its cross-examination of a defense witness. Issue three is overruled. The
judgment is affirmed.

 AFFIRMED.





 _____________________________

 STEVE McKEITHEN

 Chief Justice




Submitted on November 1, 2006

Opinion Delivered March 28, 2007

Publish


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Evidence regarding the appellant's July 2003 judgment and community supervision
order for intoxication manslaughter was admitted into evidence only in the punishment phase
of the trial, and is not at issue in this appeal.