11th Court of Appeals

 Eastland, Texas

          Opinion

 

Katina Latisha Brown  

Appellant 

Vs.                   No. 11-02-00139-CR B Appeal from Dallas County

State of Texas 

Appellee

 

The jury
convicted Katina Latisha Brown of capital murder, and the trial court assessed
her punishment at confinement for life. 
We affirm.

In her
first point of error, appellant contends that the evidence was legally
insufficient to show that she intentionally or knowingly caused the death of
the victim.  In her fourth point of
error, appellant claims that the evidence was factually insufficient to show
that she caused the death of the victim.

In order
to determine if the evidence is legally sufficient, we must review all of the
evidence in the light most favorable to the verdict and determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307 (1979); Jackson v. State, 17 S.W.3d 664
(Tex.Cr.App.2000).  In order to
determine if the evidence is factually sufficient, we must review all of the
evidence in a neutral light and determine whether the evidence supporting guilt
is so weak as to render the conviction clearly wrong and manifestly unjust or
whether the evidence supporting guilt, although adequate when taken alone, is
so greatly outweighed by the overwhelming weight of contrary evidence as to
render the conviction clearly wrong and manifestly unjust.  Vasquez v. State, 67 S.W.3d 229, 236
(Tex.Cr.App.2002); Goodman v. State, 66 S.W.3d 283 (Tex.Cr.App.2001); Johnson
v. State, 23 S.W.3d 1, 11 (Tex.Cr.App.2000); Cain v. State, 958 S.W.2d 404
(Tex.Cr.App.1997); Clewis v. State, 922 S.W.2d 126 (Tex.Cr.App.1996).  








Appellant
was indicted for the capital murder of the two-year-old victim.  The victim was nicknamed ALittle Jay,@ and that is how we will refer to him in this opinion; his father is
known as ABig Jay.@  Little Jay died of multiple blunt
injuries on September 16, 2000.  Little
Jay was the son of Juzri Nagi Flax, Sr. (Big Jay) and Vatosha Powdrell.  

Appellant
was dating Big Jay at the time of the offense. 
On September 15, 2000, Little Jay was staying at appellant=s apartment while Big Jay went out with
friends.  Appellant testified that
appellant, appellant=s son
(Daequan), and Little Jay were eating when Big Jay left.  Appellant testified that, after Daequan and
Little Jay ate and cleaned up, they played. 
She later washed them and put pajamas on them.  Appellant testified that she let the boys watch AScream@ on cable and that they fell asleep while watching the movie.  The State offered the listing of the
broadcasts on the night of September 15, 2000, to show that cable television was
not showing AScream@ that night. Appellant testified that she had given Robitussin, a cough
medicine, to both Daequan and Little Jay to keep them from getting sick.  Appellant testified that she put both boys
to bed in Daequan=s bed
between 11:30 p.m. and 11:45 p.m.  While
she was in the kitchen rinsing out her hair, appellant heard a whining-type
cry.  She went to check on the boys and
noticed that Little Jay had fallen out of the bed; she put him back to
bed.  Appellant testified that, at that
time, she noticed a small scratch on Little Jay but that he appeared not to be
injured in any way.  Appellant testified
that, after Big Jay returned home around 2:30 a.m., she asked him to check on
the boys.  She left for work around 4:00
a.m. and Aclocked in@ a little before 4:30 a.m.  She
did not check on the boys before leaving. 
Appellant testified that she stayed at work until 8:30 a.m. and that,
after making a couple of stops, she came home. 
Appellant testified that she could not sleep and that she got up and
made breakfast for the boys.  Big Jay
got up, said that he had a hangover, got something to drink, and went back to
bed.  When Daequan woke up, appellant
sent him in to awaken Little Jay. 
Appellant stated that Daequan came back and told her that there was food
in the bed and that Little Jay would not wake up.  When she went into the room, appellant saw vomit on the bed.  As she checked Little Jay for fever, his
whole body turned over when she turned him. 
Appellant then realized that Little Jay was dead.








Detective
Patricia Ann Sanmartino was one of the patrol officers called to the scene on
September 16, 2000.  Detective
Sanmartino spoke with Big Jay, Little Jay=s mom, and appellant. Detective Sanmartino testified that Big Jay and
appellant related the events of September 15 up to the time the paramedics
showed up on September 16.  Detective
Sanmartino testified that appellant had given her a very specific time line for
the events of that night.  She said that
such detail was very unusual in Aher line of work.@  Detective Sanmartino further
testified that appellant told her she gave Nyquil to Daequan and Little
Jay.  When the officers executed a
search warrant at appellant=s apartment on October 4, Detective Sanmartino and her partner found Nyquil
but did not find Robitussin.  Detective
Sanmartino testified that the sheets and pillowcases had been removed from the
bed but were later recovered from appellant=s mother.

Big Jay
testified to a time line of events similar to that to which appellant
testified.  When he came home between
2:30 a.m. and 3:00 a.m., he turned on the bathroom light directly across from
the room in which the boys were sleeping. 
He testified that he did not touch Little Jay and that nothing looked
unusual to him.  Big Jay further
testified that it had been a long time since appellant had worked overtime in
the early morning hours.  He was under
the impression that she was going to work in the morning at the normal time
because he was going to watch the boys.

The
medical examiner, Dr. Jennie Duval, testified as to her findings in the
autopsy.  Externally, Little Jay had a
raised bruise and a 1-1/2-inch long scratch on his forehead, some abrasions on
his cheek, and bruises on his back and hip. 
Dr. Duval testified that these were all recent injuries. Internally,
Little Jay suffered bleeding and swelling of the brain and  bleeding in his chest cavity.  His liver and pancreas were completely split
lengthwise.  Little Jay=s transverse colon was lacerated, and there
had been bleeding in his kidneys.  Dr.
Duval testified that all of these injuries were caused by forceful kicks or
punches to the stomach.  She stated that
these multiple blunt injuries caused Little Jay to internally bleed to
death.  








Dr. Duval
testified that Little Jay=s stomach contents were clearly recognizable.  She further testified that, if the stomach contents are
recognizable, then it is probable that the victim had eaten within two hours of
death.  Dr. Duval also stated that
vomiting could be a result of the type of injuries Little Jay suffered.  Dr. Duval testified that the toxicology
report showed that Little Jay=s blood and his pillowcase both contained the narcotics found in Nyquil
but not in Robitussin.  She further
testified that the evidence of Nyquil in Little Jay=s blood would indicate that he had taken the
medicine within one-half hour to an hour before he died.  The medical expert called by appellant, Dr.
Lloyd White, testified that the digestive studies relied upon by Dr. Duval  had been conducted only on adults and that
they were not accurate for children. However, he testified that there was
nothing to indicate that a child=s digestion would be different. 
He also stated that it was a Arule of thumb@ that
recognizable food in the stomach contents would indicate that the food had been
consumed within two hours of death. 
Both experts agreed that rigor mortis alone was not a good indicator of
the time of death.  

The
evidence showed that appellant was alone with Little Jay and Daequan from
approximately 9:45 p.m. to 2:30 a.m. on September 15, 2000.  The evidence further showed that Big Jay was
alone with the boys from around 4:00 a.m. to 8:30 a.m.  The medical evidence suggests that Little
Jay died around midnight, while he was with appellant.  The jury was the sole judge of the
credibility of the witnesses and of the weight to be given their testimony and
as such could choose to believe or disbelieve all or any part of any witness=s testimony. 
TEX. CODE CRIM. PRO. ANN. art. 36.13 (Vernon 1981); Sharp v. State, 707
S.W.2d 611, 614 (Tex.Cr.App.1986), cert. den=d, 488 U.S. 872 (1988).  The
evidence was legally and factually sufficient to support the jury=s verdict that appellant intentionally or
knowingly caused Little Jay=s death.  We overrule appellant=s first and fourth points of error. 

In her
second and third points of error, appellant argues that the trial court erred
when it allowed the State to impeach appellant and her mother through improper
cross-examination.  Appellant further
argues that the trial court also erred when it allowed the State to question
its rebuttal witness about specific acts of misconduct.   

Appellant, her mother Ernestine Brown, and
her sister Cheketa Banks testified. 
Through these witnesses, an impression was created that appellant was a
good mother and that appellant had good caregiver skills.  

 Brown
testified as follows:

Q: 
Tell us a little bit about the relationship between [appellant] and
Daequan.

 

A:  It=s a real close relationship.  She would take them -- She would take
Daequan to the movies, Chuck E. Cheese=s.

 

[PROSECUTOR]:  Your Honor, I=m going to object as to irrelevant.

 

THE COURT: 
[Defense Counsel].

 








[DEFENSE COUNSEL]:  It simply shows her interaction with children and her mothering
skills, Your Honor.

 

THE COURT: 
I=ll take it

 

[PROSECUTOR]:  It=s irrelevant, Your Honor.

 

THE COURT: 
Well, I=ll take it, [Prosecutor].  Overruled.

 

Q: 
You can answer.

 

A: 
Okay.  She would take them to
Chuck E. Cheese=s and take them to the movies, take them
skating.  When the day care would have
their outing, she would take them on the outing.  She would take off work and go. 
But when she would take off work and go, then she would go in that night
and work and I would watch him, so she would make up her time that she missed
from not being at work.  

 

Q: 
Now, in watching her with Daequan, have you ever seen any tendency on
her part to over discipline or be too physical with him?

 

A: 
No. 

 

Q:  Is
she the -- In terms of her personality, she is the type of person that, yes or
no, if she gets under stress, she might flip out and B

 

[PROSECUTOR]:  Your Honor, I=m going to object.

 

A: 
No.

 

[PROSECUTOR]:  That=s
irrelevant and improper character evidence from this witness. 

 

THE COURT: 
[Defense Counsel], you want to respond to that?

 

[DEFENSE COUNSEL]:  Well, Judge, it=s certainly not improper character evidence.  The mother is simply describing the relationship of her daughter
in a parenting situation with a young child. 
And that goes right to the very heart of what we are trying here. 

 

THE COURT: 
All right.  I=ll overrule. 
I=ll take it, [Prosecutor].

 








After a hearing outside the presence of the
jury, the trial court found that the above testimony opened the door to
rebuttal evidence; and, on cross-examination, the State asked Brown questions
concerning an incident involving another child, Tremain Davis.   The State asked Brown if she knew that
appellant was involved with Joseph Davis in 1990 and that Davis had a
9-month-old son, Tremain.  Brown
answered that she did.  The State
further asked Brown if she knew that Child Protective Services (CPS) had investigated
appellant concerning an injury to Tremain while he was in the care of
appellant.  Brown testified that she did
not.  The State also asked Brown if she
knew that Tremain was in the hospital in traction because of a broken femur
bone.  Brown said that she did.  

Appellant=s sister, Banks, testified that appellant was good to Little Jay and
that appellant treated him like her own son. 
Appellant testified on her own behalf regarding the night Little Jay
died.  She stated that she had formed an
emotional bond with Little Jay.  On
cross- examination, the State questioned appellant about her disciplining her
child, Daequan.  Specifically the State
asked:

Q:  Do
you recall telling your co-workers about a time when Daequan couldn=t remember, couldn=t tell you what he had eaten at your sister=s house and that you popped him so hard
upside the head that he flew across the car; do you remember telling your
co-workers that?

 

A: 
No, I ain=t never hit my baby in his head, nor would I
hit any other baby in the head. 

Even though this statement was made during
cross-examination, the State had not solicited this testimony.  Appellant volunteered the information.  See Dunn v. State, 804 S.W.2d 952 (Tex.App. B Eastland 1991, pet=n ref=d).  The State informed the
court of its intention to question appellant about a prior offense.  The court held a  hearing outside the presence of the jury, found that the prior
testimony offered by appellant created a false impression with the jury, and
allowed the State to rebut that false impression with the introduction of
evidence concerning the injury to Tremain. 
The State questioned appellant about being investigated by CPS after
Tremain=s injury. 
Appellant stated that she did not know that CPS specifically was
investigating her until this trial started. 
Appellant testified that she believed that Tremain=s injury was the result of a car wreck that
had happened around seven days prior to the time that the hospital admitted
Tremain for the broken leg.








After appellant testified and had rested, the
State called Dr. Carolyn J. Levitt, an expert pediatrician in the field of
child abuse.  Dr. Levitt testified that
she was a consultant in a case which involved alleged abuse to Tremain.  She reviewed X-rays and participated in the
staffing at the hospital in which Tremain was admitted.  Dr. Levitt testified that, when Tremain was
first taken to the hospital on June 11, 1990, a few days after the car accident,
the X-rays showed no fracture or injury to his leg.  On June 15, 1990, Tremain was brought to the emergency room with
swelling in his leg and a fever.  This
time, Tremain=s X-ray showed a definite fracture of his
femur.  Dr. Levitt testified that the fracture
could not have been missed in the first X-ray. 
She further testified that the fracture occurred within a few hours of
Tremain=s June 15 evaluation at the emergency
room.  Dr. Levitt gave her opinion that
the injury Tremain sustained to his leg could not have been the result of a car
accident which occurred several days prior.

A trial court=s decision to admit or to exclude evidence is reviewed under an abuse
of discretion standard.  Burden v.
State, 55 S.W.3d 608, 615 (Tex.Cr.App.2001). 
An appellate court will not reverse a trial court=s ruling unless that ruling falls outside the
zone of reasonable disagreement.  Burden
v. State, supra at 615.  The trial
courts should favor admission in close cases in keeping with the presumption of
admissibility. Montgomery v. State, 810 S.W.2d 372 (Tex.Cr.App.1991).

The limitation on introduction of evidence
relating to extraneous offenses is designed to prevent the accused from being
tried for a collateral crime.  Plante v.
State, 692 S.W.2d 487 (Tex. Cr.App.1985). 
However, TEX.R.EVID. 404 (a)(1) allows A[e]vidence of a pertinent character trait offered by an accused...or by
the prosecution to rebut the same.@  Evidence of a prior bad act is
relevant to rebut a defensive theory. 
Montgomery v. State, supra.  A witness
who testifies to the defendant=s good character may be cross‑examined regarding relevant
specific misconduct by the defendant.  
Reynolds v. State, 848 S.W.2d 785, 788 (Tex.App. ‑ Houston [14th
Dist.] 1993, pet=n ref=d).  Once a witness opens the door
by testifying to the defendant=s good character traits and presents an image of a person who would not
commit such type of offense, the State may impeach such testimony with specific
instances of conduct.  Roberts v. State,
29 S.W.3d 596 (Tex.App. B Houston [1st Dist] 2000, pet=n ref=d). 
However, the right to cross‑examine a character witness on
specific instances of a defendant=s conduct is subject to two limitations:  first, there must be some factual basis for the incidents
inquired about; and second, those incidents must be relevant to character
traits at issue in the trial.  Wilson v.
State, 71 S.W.3d 346, 350-51 (Tex.Cr.App.2002).  








Taken together and in context, the testimony
offered by appellant and her witnesses created the impression that appellant
would never harm Little Jay or any other child.   Appellant specifically denied committing the charged
offense.  Additionally, she stated that
she would never Ahit any other baby in the head.@ 
While some of Little Jay=s injuries were to his head, we do not think that, when taken in the
context of the whole case, appellant=s testimony would limit rebuttal testimony solely to head
injuries.  Her mother and sister
testified that appellant was a good mother and was not abusive toward Little
Jay.  This direct evidence tends to
leave the impression that she never had been and never would be abusive toward
children.  These broad statements and
assertions exposed appellant to rebuttal proof of similar acts against other
children.  When a false picture is
presented by a defendant, the prosecution may impeach the defense witnesses= testimony by introduction of extraneous
offenses.  The court found that the
State had a good faith basis for introducing the extraneous offense.  The questions asked by the State referred to
an incident very similar to the offense in this case.  Tremain was the son of appellant=s boyfriend at the time and was in appellant=s care. 
The testimony reflected upon appellant=s child-care skills and rebutted the impression Brown and appellant
left with the jury that appellant had good mothering skills.  Further, the testimony of Dr. Levitt
impeached not only appellant=s testimony regarding actions toward other children but also appellant=s testimony that the injury to Tremain was
from the car accident.  The trial court
did not abuse its discretion in allowing the impeachment testimony.  Appellant=s second and third points of error are overruled.   

The judgment of the trial court is affirmed.                                   

 

JIM R. WRIGHT

JUSTICE

 

June 26, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of: Wright, J., and

McCall, J., and Dickenson, S.J.[1]











[1]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.