NUMBER 13-05-457-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

JEANINE HANNAH, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 93rd District Court of Hidalgo County, Texas.


 


MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Benavides


Memorandum Opinion by Justice Benavides
 

 Margaret Bradley died from an insulin overdose on May 30, 2002. At age sixty-eight, while Bradley suffered from several maladies--she was confined to a wheelchair due
to partial paralysis and suffered from multiple sclerosis--she was not diabetic. The State
of Texas charged appellant, Jeanine Hannah, with causing Bradley's death by injecting her
with a massive amount of insulin. See Tex. Penal Code Ann. § 19.02(b) (Vernon 2003). 
A jury convicted Hannah, and the trial court assessed a ninety-nine year sentence. Id. §
12.32(a) (Vernon 2003). Hannah now appeals, arguing that (1) the trial court abused its
discretion by allowing the State to present evidence of extraneous bad acts to which
Hannah was linked; (2) the evidence supporting her conviction is legally insufficient; and
(3) the evidence supporting her conviction is factually insufficient. We affirm.

I. Background

 Hannah's trial took place between May 16th and May 27th in 2005. Over the course
of eight days and approximately twenty witnesses, the following narrative emerged. 

A. Bradley's Death

 In early 2002, Bradley was living in McAllen, Texas, with her daughter, Rhonda, and
Rhonda's common-law husband, Michael Neiger. Because of her infirmities, Bradley
needed domestic assistance. Rhonda hired Kelly Health Care, Inc. ("Kelly Health") to
provide a caretaker. In February of 2002, Kelly Health sent a registered nurse, Jeanine
Hannah, to assist Bradley. Hannah visited Bradley twice a day, once in the morning and
once in the afternoon, to help Bradley with routine tasks such as feeding and bathing. 
Medicare covered the morning visits, and Bradley paid Hannah for the afternoon visits via
personal check.

 Although Bradley needed Hannah's help with some things, she did not need help
taking her medication. Bradley took medication for her many ailments, but she took them
on her own. The medicines hung from a bag on the handle of Bradley's scooter where she
could access them easily. Insulin was not among her medicines. In fact, none of her
medicines were taken by injection as insulin is generally taken.

 Bradley did, however, like to receive occasional injections of vitamin B-12. Because
she trusted Hannah's credentials as a registered nurse, she asked Hannah to inject her. 
The B-12 syringes, which Bradley stored under the bathroom sink, were much larger than
ordinary insulin syringes. Bradley's daughter, Rhonda, was a registered nurse, and she
testified that the syringes could hold approximately three times the insulin dosage for a
normal diabetic person.

 On May 29, 2002, Michael returned home from work at about 5:40 p.m. and found
Bradley non-responsive, mumbling, and "look[ing] real clammy and dazed." He also
noticed that her mobility was restricted because she was struggling to grasp a cup that she
ordinarily grasped easily. Michael called Rhonda at work to alert her, reasoning that
because Rhonda was a nurse at McAllen Heart Hospital, she "had more knowledge" about
such things.

 According to Rhonda's testimony and cell phone records, she had already spoken
to her mother over the phone at 3:35 p.m. that day and to Hannah at 3:36 p.m. Hospital
employment records and a store receipt show that Rhonda clocked out of work at 3:23
p.m. that afternoon and made a purchase at the J.C. Penney store at La Plaza Mall in
south McAllen. She returned to work at 4:20 p.m., and she received the phone call from
Michael about Bradley's condition at 5:43 p.m.

 Rhonda rushed home and sat with her mother for about forty minutes. She grew
concerned about Bradley's deteriorating condition and called an ambulance at 6:26 p.m. 
The ambulance crew conducted blood tests and determined that Bradley was suffering
from unusually low blood-sugar levels. At the hospital, her blood-sugar levels fluctuated
for the next twenty-four hours, and doctors could not determine the cause of the instability. 
She died the following evening. (1) 

B. Bradley's Checks

 At the time of her death, Bradley had accounts at two banks, Wells Fargo and Texas
State Bank. When Rhonda went to the banks to see how much money Bradley had for
funeral expenses, she noticed discrepancies between the ledgers in Bradley's check book
and the bank's records. This prompted her to investigate recent activity in both accounts,
and she uncovered some unusual transactions.

 First, Bradley's ledger listed check #5038 as having been written for $566 for
groceries, but according to the bank, the check had actually been written to AIG Insurance. 
Rhonda discovered that the check paid for an auto insurance policy for William and Aloha
Shuell of Mission, Texas. Hannah was a covered driver on the policy.

 Second, Rhonda found check #5051 in her mother's paper shredder. When she
taped it back together, she noticed that it was a voided check for $160 written to Hannah
and stamped with Bradley's signature stamp. (2) Rhonda later discovered that the $160
check had been voided when Hannah tried to cash it. 

 Two employees of Coastal Bank, Yadira Reyna, a teller who received the check,
and Sandra Vecchio, her supervisor, testified that Hannah had come through the
drive-through in May 2002 seeking to cash what appeared to be an altered check written
on Bradley's Wells Fargo account. Originally, the check had been written for $60, but the
number "1" had been added in a different colored ink, altering the check to read "$160." 
On the instruction of Vecchio, Reyna voided it. Reyna recalled Hannah becoming very
upset about the bank's refusal to cash the check and insisting that it was Bradley who had
altered the number.

 Third, check #5029 had been listed in Bradley's ledger as written to Rhonda's sister,
Paula Tveit. Tveit testified that her mother often sent her checks of between $50 and
$100. She stated that Bradley recently promised to send a check, but she never received
it. Rhonda discovered that check #5029 was actually cashed by Hannah for $1,300, and
Hannah's name is written over Tveit's name on the check. Tveit further testified that her
mother would not have sent her $1,300, and a $300 check was far more likely. The $1,300
check and two other checks--a $21.59 refund from Southwestern Bell and a $412.82
annuity from Allstate--were all deposited in Hannah's bank account on May 31, 2002, the
day after Bradley's death. 

 A Texas State Bank teller, Anita Munoz, testified at trial that she knew Hannah to
be a regular bank customer and that she noticed on May 31, 2002 that a $1,300 check
Hannah sought to cash had been altered. Munoz was reluctant to cash the check, but she
said Hannah insisted that she at least deposit it, and "charge it to her [Hannahs's] account"
if any problems arose. Munoz testified that her superiors at the bank were "furious" about
the incident and that she nearly lost her job over it.

 Finally, Rhonda was perplexed to see that a balance of only $200 remained in her
mother's Texas State Bank account due to six recent ATM withdrawals ranging from $200
to $300. According to Rhonda, this was odd because Bradley did not have the ability to
use an ATM herself. Moreover, she had traditionally only wanted about $50 in cash per
month, which she used to play bingo. All of these dubious transactions caused Rhonda
to remember that approximately one month before her death, Bradley had complained that
Hannah asked too many financial questions and wanted to write checks on Bradley's
behalf. 

C. Bradley's Insulin Levels

 Rhonda testified that her suspicions were overwhelming at this point. She asked
Luis Padula, M.D., to examine lab results from a c-peptide test given to Bradley during her
stay at the hospital, the results of which were not received until after Bradley's funeral. (3) 
Dr. Padula told her that the test indicated that Bradley, at the time of her death, had a
massive excess of insulin in her body. Furthermore, the c-peptide test conclusively ruled
out both pancreatic cancer and endogenous hyperinsulinsim. Dr. Padula further told
Rhonda, and later testified in court, that although he could not determine how much or
what type of insulin had been injected, it was clear that the amount was vastly greater than
would be necessary to treat any patient, even a diabetic.

 These opinions were echoed by Mercy Bayot-Moore, M.D., an endocrinologist who
examined Bradley's insulin levels before her death and observed that Bradley had an
insulin reading of 400, well above the normal reading of around 27. The attending doctors
then filed an amended death certificate, listing Bradley's cause of death as an exogenous
insulin overdose.

 Rhonda notified the police about these developments on June 6th, but by then,
Bradley's funeral had already taken place, and she had been cremated. In 2004,
two-and-a-half years after Bradley's death, Hannah was arrested and indicted for knowingly
and intentionally causing death and serious bodily injury to Bradley.

D. Hannah's History

 At Hannah's trial, testimony revealed that before she arrived in McAllen to work for
Kelly Health, Hannah had an unusual employment history, characterized by changing jobs
frequently, using aliases (she has been known at different times as Jeanine Hannah,
Jeannie Miata, and Julie Kocian), and being connected to a suspicious--possibly
criminal--incident in Oregon. We discuss this history herein, because Hannah objected
to the following testimony under Texas Rules of Evidence 104, 404(b), and 403 and
because the evidentiary relevance of the history is the principal issue on appeal.

 First, Troya Brown, an Oregon resident, testified that Hannah worked with her at a
rehabilitation facility in Beaverton, Oregon, in 2001. At that time, according to Brown,
Hannah was known as Jeannie Miata. Brown testified about an incident that occurred on
September 10, 2000. On that day, she came to work at 6:30 a.m. and encountered
Hannah completing her night shift and monitoring an elderly patient named Anne Jones. 
Hannah asked Brown, in an unusually adamant fashion, not to walk into Jones's room to
check on her because the patient had "had a rough night." Brown found her co-worker's
insistence to be odd, and she ignored the request. Hannah followed Brown into the
patient's room and began insisting that Brown verify the insulin amount which she had
administered to Jones. Brown testified that she found this to be odd behavior also.

 Janice Nezbeda, the nursing director at the Beaverton facility, who also knew
Hannah as Jeannie Miata at the time, arrived that day at 9:00 a.m. She found Jones
unconscious in her room and with a very low blood-sugar level of 13. She testified that a
normal reading would have been between 60 and 80. Moreover, just two hours
beforehand, Jones's blood-sugar levels had been at 100. Jones died later that day.

 Jones appeared to have signed a "do not resuscitate" form ("DNR"), but James
Green, an expert in forensic document examination, testified that he did not believe that
Jones's DNR had actually been signed by Jones. In fact, he completely excluded the
possibility. Green also examined Hannah's handwriting, and he applied a system in which
the likelihood of forgery is assigned a number on a one-to-nine scale, with nine being the
most likely. On this scale, Green testified that the likelihood that Hannah had forged
Jones's signature on the DNR was a seven.

 Jones's daughter, Marjorie Wooliver, testified that after Jones's death, a diamond
ring was missing from her finger. Nurses and others who had attended to Jones
remembered the ring, but they did not know what happened to it. Wooliver doubted that
the ring would simply have slipped off because Jones's fingers had become swollen with
illness, making the ring very difficult to remove. Nezbeda announced that she would be
launching an investigation into the loss of the ring, but two days later--before the police
were notified--the ring appeared in Nezbeda's office mailbox. It was placed in an
envelope and left anonymously. No charges were filed over the brief disappearance of the
ring.

 After this incident, Hannah moved to Texas and took a job in the city of Mission
under the name "Julie Kocian." At trial, Minerva Ruiz, the director of Mission Hospital,
identified Hannah as the registered nurse who worked at the hospital under that name from
June to September of 2001.

 Ruiz gave specific testimony about the particulars of insulin. She testified that it can
remain effective for several months, and it does not have an expiration date of just a matter
of days, "like milk." Ruiz testified that Hannah was knowledgeable about these particulars
and had access to the hospital's insulin cache. Hannah worked in an area of the hospital
where over seventy percent of the patients were in need of regular insulin injections. 
Mission Hospital, Ruiz explained, kept its insulin stored in a locked refrigerator to which
Hannah and all the other nurses had a key. According to Ruiz, there is no accounting
system for the insulin, and if some of it were missing or stolen, it would be difficult to
detect.

 Ruiz testified that Hannah left the hospital due to a work-related injury. It was after
leaving Mission Hospital that Hannah joined Kelly Health and began working with Bradley.

E. Hannah's Defense Strategies

 Hannah appears to have had two defensive strategies at trial. First, she questioned
whether an insulin overdose was the true cause of Bradley's death. Second, she sought
to raise reasonable doubt by suggesting that Bradley's daughter, Rhonda, had the
opportunity and the motive to kill Bradley by injecting her with exogenous insulin. For
example, during Rhonda's cross-examination, Hannah's defense counsel led Rhonda to
testify that, as a nurse, she had regular access to insulin and, in fact, she had once brought
insulin home from the hospital:

 Q: At your place of employment you have access--as a registered nurse
you have access to insulin?

 

 A: Yes, sir.

 

 Q: And, in fact, do you recall back on June 30th, 2002 when you spoke
to Detective Ralph Ramirez-- 

 

 A: Yes, sir.

 

 Q: --that approximately five years ago you had accidentally taken some
insulin home? Do you recall that?

 

 A: Yes, sir.

 

. . . .

 

 A: I returned the medication to the hospital, and I threw it in the trash--

 

 Q: Okay.

 

 A: --because it had been out of the refrigerator for so long.

 

 Q: Okay. Do you have a recollection as to why you would have had that
insulin, again back five years ago, and mistakenly taken it home?

 

 A: I had administered it to a patient and put it in my pocket in a hurry and
just never checked my pockets before I left home.


 After this questioning, Hannah's counsel asked Rhonda why, during her direct
examination, she felt the need to offer time records from McAllen Heart Hospital and a J.C.
Penney receipt to prove her whereabouts on the apparent afternoon of Bradley's overdose. 
Rhonda replied that after speaking with the detective who was investigating the death, it
became a "concern" of hers to provide evidence of her whereabouts. Finally, Hannah's
defense counsel forced Rhonda to disclose that she was a "compulsive gambler" and that,
in the past, Bradley had helped Rhonda pay off gambling debts. Rhonda also testified that
Bradley had borrowed $10,000 on a credit card to help Rhonda purchase a car.

 At the conclusion of the trial, Hannah was found guilty of killing Bradley and
sentenced to ninety-nine years in prison. She now appeals.

II. Standards of Review

 The first issue in this case, comprised of three sub-issues, concerns the trial court's
ruling on the admissibility of evidence; such issues are reviewed for abuse of discretion. 
Sauceda v. State, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004). "The trial court abuses
its discretion when the decision lies outside the zone of reasonable disagreement." 
McCarty v. State, No. PD-1139-07, 2008 WL 2512818, at *1 (Tex. Crim. App. June 25,
2008) (citing Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App.1992)). 

 The two remaining issues concern sufficiency of the evidence. To assess whether
the evidence supporting a verdict is legally sufficient, we consider all the evidence in the
record in the light most favorable to the jury verdict and determine whether a rational jury
could have found the defendant guilty of all the elements of the crime beyond a reasonable
doubt. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v.
Virginia, 443 U.S. 307, 318-19 (1979)); Swearingen v. State, 101 S.W.3d 89, 95 (Tex.
Crim. App. 2003). "In reviewing the sufficiency of the evidence, we should look at 'events
occurring before, during and after the commission of the offense and may rely on actions
of the defendant which show an understanding and common design to do the prohibited
act.'" Hooper, 214 S.W.3d at 13 (quoting Cordova v. State, 698 S.W.2d 107, 111 (Tex.
Crim. App.1985)). While each fact may not point directly and independently to the
appellant's guilt, we may affirm "as long as the cumulative force of all the incriminating
circumstances is sufficient to support the conviction." Id. Circumstantial evidence alone
may be enough to establish guilt. Id. 

 To assess whether the evidence behind a verdict is factually sufficient, we review
the evidence in a neutral light to determine whether (1) the evidence is so weak as to
render the jury verdict clearly wrong and manifestly unjust or (2) whether the evidence
supporting the verdict is so outweighed by the great weight and preponderance of the
contrary evidence as to render the verdict clearly wrong and manifestly unjust. Grotti v.
State, No. PD-134-07, 2008 Tex. Crim. App. LEXIS 761, at *22-23 (Tex. Crim. App. June
25, 2008). We must show great deference to a jury verdict. Watson v. State, 204 S.W.3d
404, 417 (Tex. Crim. App. 2006). "An appellate court judge cannot conclude that a
conviction is 'clearly wrong' or 'manifestly unjust' simply because, on the quantum of
evidence admitted, he would have voted to acquit had he been on the jury. Nor can an
appellate court judge declare that a conflict in the evidence justifies a new trial simply
because he disagrees with the jury's resolution of that conflict." Id. at 417.

III. Admissibility of Extraneous Offense Evidence

 It is a fundamental principle of law in all English-speaking jurisdictions that
defendants must only be tried for the crimes for which they have been charged, not other
disconnected crimes. Turner v. State, 754 S.W.2d 668, 671 (Tex. Crim. App. 1988) (citing
Young v. State, 261 S.W2d 836, 837 (Tex. Crim. App. 1953)). Therefore, to avoid undue
prejudice to defendants, the circumstances under which we permit evidence of extraneous
offenses at trial are limited. See Tex. R. Evid. 404(b) (listing justifications for permitting
extraneous offense evidence); see also Tamez v. State, 48 S.W.3d 295, 296 (Tex.
App.-San Antonio 2001, no pet.) (holding that prohibition on use of extraneous offense
evidence is a "basic tenet of our criminal justice system") (quoting Smith v. State, 12
S.W.3d 149, 152 (Tex. App.-El Paso 2000, pet. ref'd)).

 Hannah argues that the jury heard evidence of two prior offenses for which she was
not charged or convicted: (1) theft of insulin from Mission Hospital; and (2) Jones's death
by insulin overdose and the apparent theft of her ring in Oregon. She argues that the
admission of this evidence violated Texas Rules of Evidence 104, 404(b), and 403. Tex.
R. Evid. 104, 404(b), 403. We must assess whether the trial court abused its discretion in
admitting this evidence. To do this, we need to determine whether (1) the State proved
that Hannah's involvement in the extraneous offenses was probable beyond a reasonable
doubt, id. at R. 104; (2) the evidence was properly admitted under an exception to the
general prohibition against evidence of extraneous bad acts, id. at R. 404(b); and (3) the
probative value of the evidence outweighed the unfair prejudice to Hannah. Id. at R. 403. 

A. Texas Rule of Evidence 104(b)

 For evidence of Hannah's extraneous offenses to be permitted at trial, the State was
required to demonstrate beyond a reasonable doubt that Hannah had committed the
offenses. See id. at R. 104(b) ("When the relevancy of evidence depends upon the
fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction
of evidence sufficient to support a finding of the fulfillment of the condition."); Ex parte
Varelas, 45 S.W.3d 627, 630-31 (Tex. Crim. App. 2001). In this case, the State met this
requirement.

 1. A Reasonable Jury could have Determined Beyond a Reasonable Doubt
that Hannah had Knowledge of and Access to Insulin at Mission Hospital.


 Hannah argues that the trial court erred in admitting evidence that she stole insulin
from Mission Hospital because there was no evidence that she administered insulin to
patients there or that insulin had ever been missing from the hospital. We disagree.

 It is true that no direct evidence was presented that Hannah had stolen insulin from
Mission Hospital, but the issue in this case is whether a reasonable jury could have found
that she had knowledge of insulin and access to it within a reasonable time before
Bradley's death. The evidence on this point is stark. Hannah had a key to a locked
medication room. Ruiz testified that Hannah had "working knowledge" of insulin and its
effects. Hannah worked in an area where over seventy percent of the patients were in
need of regular insulin injections. A jury could have found beyond a reasonable doubt that
she had access to insulin and knowledge of its use. 

 2. A Reasonable Jury could have Determined that Hannah was Culpable in
Jones's Death and the Theft of her Ring


 The evidence presented of Hannah's link to Jones's death and the theft of her
ring--testimony by five witnesses--was substantial. To begin, two witnesses, Brown and
Nezbeda, from Beaverton Rehabilitation in Oregon testified that Hannah was the woman
with whom they once worked and who they knew as Jeannie Miata. Their testimony
revealed that Hannah behaved in an awkward and suspicious manner on the morning of
September 10th, when she urged Brown to stay away from Jones. Brown also testified
that she found it odd that Hannah would request verification of the insulin dosage she had
administered to Jones, but not verification for her other patients. In fact, Brown testified
that it was odd that Hannah would even be present in the rehabilitation facility, given that
her shift had already ended. Brown and Nezbeda both explained that later that day, and
soon after exhibiting an extremely low blood-sugar level, Jones died from an insulin
overdose.

 Jones's DNR had been signed, but Green, a forensic document examiner, testified
that he did not believe that Jones's signature was on the document. He further testified
that, after he reviewed Hannah's handwriting, he believed it was "probable" that the
signature was Hannah's. He assigned the precise probability that Hannah had forged
Jones's signature as a "seven" on a one-to-nine scale (one being least likely, and nine
being most likely).

 Finally, evidence was presented that a diamond ring disappeared from Jones's hand
and was later anonymously returned only after the facility director threatened to refer the
incident to the police. After the incident, Hannah left Oregon and changed her name.

 We believe this evidence, cumulatively, could have led a reasonable jury to
conclude beyond a reasonable doubt that Hannah was culpable in this incident. A jury
could infer that Hannah most likely killed Jones by injecting her with an overdose of insulin
and then expedited her plan by forging Jones's signature on the DNR and urging other
nurses to stay away. See Hooper, 214 S.W.3d at 13 (permitting inferences by juries as
long as each inference is supported by the evidence at trial). A reasonable jury could have
further inferred that Hannah stole the diamond ring but became worried when Nezbeda
announced an investigation and furtively replaced the ring. Id. 

B. Rule 404(b)

 Although the extraneous offense evidence against Hannah met the requirements
of rule 104(b), it must also meet the requirements of rule 404(b) or it must rebut a
defensive theory in order to be admissible. See Tex. R. Evid. 404(b) (extraneous offense
evidence must demonstrate proof of "motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake or accident" rather than merely going towards
the defendant's character); Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)
("Extraneous-offense evidence is not inadmissible under Rule 404(b) when it is offered to
rebut an affirmative defense or a defensive issue that negates one of the elements of the
crime."). We believe that both the extraneous offenses in this case meet these
requirements. The evidence of Hannah's theft of insulin from Mission Hospital is
admissible as rebuttal evidence; the evidence of her involvement in the Oregon incident
is admissible for proving modus operandi.

1. Evidence of Hannah's Possible Theft of Insulin from Mission Hospital

 The evidence of Hannah's knowledge of and access to insulin at Mission Hospital,
suggesting a possible theft, was admissible in this trial because it was used to rebut a key
defensive theory proffered by Hannah. See Casey, 215 S.W.3d at 879; Powell v. State,
63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001) (holding that the State is entitled to rebut
defensive theories raised by the defense in the opening statement).

 In his opening statement, Hannah's counsel explained to the jury that one of his
defensive strategies in the trial would be to deny that Hannah was the source of the
exogenous insulin that killed Bradley. In fact, he told the jury that the evidence in the trial
would demonstrate that Hannah did not even have access to insulin:

 First, [the evidence] will not establish that Jeanine Hannah, the
Defendant, was the source of the insulin overdose. There is not going to be
any evidence about that. Number two, there is not going to be any evidence
that Jeanine Hannah had access either at work or at her place of work or at
the hospital of access [sic] or possession of insulin. 


 In order to rebut this argument, the State was permitted to show that Hannah had
access to insulin during her employment as a nurse at Mission Hospital. See Casey, 215
S.W.3d at 879; Powell, 63 S.W.3d at 438-40. Hannah asserts that this is an insufficient
justification because she was not working at Mission Hospital at the time of Bradley's
death, and thus, she did not have access to insulin at the relevant time. This argument,
however, is countered by Ruiz's testimony that insulin can remain effective for several
months, and it does not have an expiration date of just a matter of days.

 Thus, according to testimony adduced at trial, Hannah had access to useable insulin
within a reasonable time frame before Bradley's death, and the State presented this
evidence in direct response to a defensive theory proffered by Hannah's counsel. It was
not, therefore, an abuse of discretion to allow it into evidence.

2. Evidence of Hannah's Culpability for Jones's Death and the Ring

 We also believe the evidence of the incident in Oregon was properly introduced
because it demonstrated modus operandi, which refers to "a defendant's distinctive and
idiosyncratic manner of committing criminal acts." Casey, 215 S.W.3d at 880-81 (quoting
Owens v. State, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992)). "Evidence of a defendant's
particular modus operandi is a recognized exception to the general rule precluding
extraneous offense evidence, if the modus operandi evidence tends to prove a material
fact at issue, other than propensity." Owens, 827 S.W.2d at 915. We do not recognize the
modus operandi exception here merely because multiple murders are involved; the State
must show not only repeated crimes, but "particularized details or unique qualities of the
two acts." Martin v. State, 173 S.W.3d 463, 467-68 (Tex. Crim App. 2005); Owens, 827
S.W.2d at 915.

 The modus operandi exception is also important because it can implicate the
"doctrine of chances," which holds that evidence of the repetition of similar unusual events
over time demonstrates a decreasing probability that the events occurred merely by
chance. Daggett v. State, 187 S.W3d 444, 453 n.18 (Tex. Crim. App. 2005); Martin, 173
S.W.3d at 467; Plante v. State, 692 S.W2d 487, 491-92 (Tex. Crim. App. 1985). The
doctrine reflects the principle that evidence of striking similarities between two rather
idiosyncratic crimes is evidence that the same perpetrator was behind both crimes, and
such evidence is admissible under 404(b) for its probative value--not merely to unfairly
attempt to try the defendant for an extraneous offense. See Tex. R. Evid. 404(b).

 Here, the trial court specifically commented on the insulin overdose deaths in
Oregon and Texas being a "distinctive and idiosyncratic manner of committing criminal
acts." We agree. Exogenous insulin, unlike firearms or knives, is not commonly used as
a murder weapon. 

 Moreover, Hannah's defensive theory appears to have been to implicate Rhonda,
Bradley's daughter, in the administration of the excess insulin. The defense spent much
of its cross-examination of Rhonda focusing on the fact that she was a registered nurse
who had taken insulin home from the hospital before and that she was a compulsive
gambler who relied upon Bradley to help pay her gambling debts. The State offered the
evidence of Jones's death in Oregon in order to show that even if both Rhonda and
Hannah had equal access to insulin, only Hannah could be connected to a modus
operandi. This particular modus operandi was to murder elderly patients via insulin
overdose and steal from them. The trial court explained this reasoning in clear terms, and
we cannot say that its decision to allow the evidence was an abuse of discretion.

C. Texas Rule of Evidence 403 

 Finally, we do not believe the trial court abused its discretion by determining that the
probative value of the extraneous offense evidence substantially outweighed the danger
of unfair prejudice to Hannah. See id. at R. 403. "Unfair prejudice" does not arise from the
mere fact that evidence injures a party's case, because virtually all evidence that a party
offers will be prejudicial to the opponent's case. Casey, 215 S.W.3d at 883. Evidence is
"unfairly prejudicial" when it tends to have some adverse effect on a defendant beyond
tending to prove the fact or issue that justifies its admission. Id. 

 [A] trial court, when undertaking a Rule 403 analysis, must balance (1)
the inherent probative force of the proffered item of evidence along with (2)
the proponent's need for that evidence against (3) any tendency of the
evidence to suggest decision on an improper basis, (4) any tendency of the
evidence to confuse or distract the jury from the main issues, (5) any
tendency of the evidence to be given undue weight by a jury that has not
been equipped to evaluate the probative force of the evidence, and (6) the
likelihood that presentation of the evidence will consume an inordinate
amount of time or merely repeat evidence already admitted.


Gigliobianco v. State, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). The factors in this
balancing test frequently blend together in practice. Id.


 Applying these factors, we first note that the inherent probative force of both
extraneous offenses was significant because it tended to prove Hannah's opportunity to
access insulin and her possible modus operandi, which Hannah disputed vehemently. 
Casey, 215 S.W.3d at 882 (extraneous offense evidence probative to dispute central issue
at trial as raised by defense). Second, the State's need for the evidence was significant
because it was the only evidence available to the State to rebut the defensive theory that
Bradley's daughter Rhonda was a more plausible source of the insulin than Hannah. Id.
at 883-84 (probative force of evidence centered in State's inherent inability to rebut
defensive arguments). 

 The evidence is certainly prejudicial, but we cannot say that such prejudice was
unfair. There is no indication in the record that the jury was unequipped to evaluate the
probative force of the evidence. Because the evidence was significant, but not repetitious,
it did not consume an inordinate amount of time. There is nothing in the record to show
that the evidence confused the jury or suggested a decision based on an improper basis
(i.e., a verdict based on the extraneous offenses rather than the instant offense).

 The trial court is presumed to have applied the same analysis in deciding to allow
the evidence against Hannah. See Williams v. State, 958 S.W.2d 186, 195 (Tex. Crim.
App. 1997) (holding that the balancing test is presumed to have been conducted if the trial
record is silent on the test). We give great deference to the trial court's conduct of the test,
and we do not believe it was an abuse of discretion to determine that the probative value
of the evidence outweighed its prejudicial nature.

IV. Legal Sufficiency

 Hannah next argues that even if the trial court did not abuse its discretion in
admitting the extraneous offense evidence, the cumulative evidence is nevertheless legally
insufficient to support a guilty verdict because there is no direct evidence of her guilt. We
disagree with Hannah's framing of the legal sufficiency issue, and we further believe that
the evidence in the record--considered in the light most favorable to the verdict--is legally
sufficient to support a guilty verdict because it could have led a rational jury to find Hannah
guilty of all the elements of murder beyond a reasonable doubt. See Swearingen, 101
S.W.3d at 95.

 The Texas Court of Criminal Appeals recently clarified the test for legal sufficiency. 
See Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Even absent direct
evidence, the court explained that juries are "permitted to draw multiple reasonable
inferences as long as each inference is supported by the evidence presented at trial." Id.
at 15. Therefore, contrary to Hannah's argument, circumstantial evidence alone can be
sufficient to establish guilt. Id.

 In this case, we believe the cumulative evidence--even if it is primarily
circumstantial--is overwhelmingly against Hannah because the inferences which the jury
was required to draw about her motive and opportunity were reasonably supported by the
facts adduced at trial. For example, a jury could have made a reasonable inference about
Hannah's motive to murder Bradley. In its closing argument, the State told the jury that its
theory of motive in this case was "that Jeanine Hannah was stealing from Margaret
Bradley. And then she wanted to cover up these thefts because [she] was about . . . to get
caught." The State supported this theory of motive with extensive facts about strange
transactions in Bradley's bank accounts: (1) a check which Bradley's ledger had marked
as "groceries," but which in reality, had paid for an insurance policy for Hannah; (2) a
shredded check Coastal Bank voided because it appeared fraudulent; (3) a check,
originally thought by a bank teller to be fraudulent, written in Hannah's ledger to Bradley's
daughter Tveit for an unusually large amount--but which was actually cashed by Hannah;
(4) refund and annuity checks to Bradley deposited in Hannah's account the day of
Bradley's death; and (5) frequent ATM withdrawals from Bradley's account for amounts far
larger than she had ordinarily withdrawn. Finally, the State presented evidence that
Bradley had begun to grow suspicious about Hannah's questions about her finances. A
reasonable jury could have heard this evidence and inferred that Hannah was
systematically stealing from Bradley, feared being caught, and had the motive to kill her. 

 A reasonable jury could also have found beyond a reasonable doubt that Hannah
had the opportunity to kill Bradley, given that (1) she had working knowledge of insulin from
her training as a nurse and her prior access to it at Mission Hospital; (2) she was entrusted
to administer injections to Bradley; (3) she was the last person known to be with Bradley
before the onset of her condition; and, most strikingly, (4) Hannah's link to a remarkably
similar incident in Oregon.

 In short, the State presented a full narrative which, in its cumulative effect, made a
legally sufficient case that Hannah killed Bradley. Because a jury could have made
reasonable inferences based on the evidence presented to reach this conclusion, we may
not overturn the jury's verdict. See Hooper, 214 S.W.3d at 13. We overrule Hannah's
second issue.

V. Factual Sufficiency

 Hannah's final argument on appeal is that the evidence presented at trial is factually
insufficient to support the guilty verdict. Evaluating the evidence in a neutral light, favoring
neither party, we cannot say that the guilty verdict is clearly wrong and manifestly unjust,
or that the evidence in support of the judgment is outweighed by the great weight and
preponderance of the contrary evidence. See Grotti, 2008 Tex. Crim. App. LEXIS 761, at
*22-23.

 As we noted above, the evidence linking Hannah to Bradley's death is
overwhelming: the unusual bank account activity; her knowledge of and access to insulin;
her connection to Jones's death and the theft of her ring in Oregon; and the fact that she
was the last person known to be with Bradley before the onset of the condition that led to
her death. This evidence is far too substantial for us to be able to describe the verdict as
clearly wrong and manifestly unjust. See Watson, 204 S.W.3d at 414-15.

 Moreover, while it is true that there is some evidence in the record that conflicts with
the jury's verdict, it is hardly enough to describe the guilty verdict as against the "great
weight and preponderance of the evidence." To begin, we recognize that the cause of
death in this case is indefinite because no autopsy was performed, but the logic of this
point is limited. After all, no autopsy was performed because the revelations about the
c-peptide test emerged only after the cremation had already been performed. At that point,
while an autopsy would have been helpful, it was not necessary because multiple medical
experts examined the c-peptide test results and agreed on the cause of death. The
doctors were, in fact, so convinced that Bradley had died of an insulin overdose that they
changed her death certificate to reflect this finding.

 Hannah also sought to implicate Rhonda in Bradley's death. This explanation,
however, is implausible given that we have a virtually minute-by-minute record of Rhonda's
whereabouts on the day before Bradley's death. According to employment records,
Rhonda spent most of the day at work. Phone records show that she called and spoke to
both Bradley and Hannah. Finally, for the one time of day that she did step away from
work--between 3:23 and 4:30--she can provide a time-stamped receipt from J.C. Penney,
proving that she had been shopping there. As the State emphasized, Rhonda's home is
in northeast McAllen, but the J.C. Penney at which she was shopping is in the southern
part of the city. It would have been exceedingly difficult--if possible at all--for Rhonda to
leave work, go to the mall, go home to injure Bradley, and finally drive back to work, all
within the span of less than an hour.

 This contrary evidence is not substantial enough to overwhelm the evidence
supporting the verdict. The evidence implicating Hannah was factually sufficient, and we
overrule Hannah's third issue. 

VI. Conclusion


 For the reasons outlined above, we believe that the trial court did not abuse its
discretion by allowing the State to present evidence of Hannah's extraneous bad acts at
Mission Hospital or in Oregon. Moreover, we believe that the evidence supporting her
conviction is legally and factually sufficient. The judgment of the district court is therefore
AFFIRMED.

 


 

 

 GINA M. BENAVIDES

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this the 21st day of August, 2008. 
1. 
The doctors first listed secondary adrenal insufficiency as the cause of death. As we explain,
however, the cause of death was later changed to an exogenous insulin overdose. See infra Part I, C.
2. Bradley had two such stamps which she normally kept in her medicine bag. Rhonda testified that
one of them was missing.
3. 
 A c-peptide test reveals how much naturally-produced insulin should be in the body. See Web-MD,
Diabetes Health Center, available at http://diabetes.webmd.com/c-peptide (Last Visited Aug. 5, 2008).