Jeffrey D. PLANTE, Appellant,

v.

The STATE of Texas, Appellee.

No. 754–84.

Court of Criminal Appeals of Texas, En Banc.

June 19, 1985.

488

Frank Jackson, John H. Hagler, Dallas, for appellant.

Henry Wade, Dist. Atty., Kathi Alyce Drew and Richard Zadina, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

CAMPBELL, Judge.

Appellant was convicted for the felony offense of theft by deception. V.T.C.A. Penal Code, §§ 31.03, 31.01(2)(E), (4). The jury assessed punishment at ten years confinement in the Texas Department of Corrections. The Dallas Court of Appeals reversed his conviction in a published opinion. *Plante v. State,* 674 S.W.2d 368 (Tex.App. —Dallas 1984). We granted the State's petition for discretionary review to determine whether the court of appeals erred in holding that the trial court committed reversible error in admitting certain extraneous offenses at trial. We reverse.

The facts are set forth in detail in the ·opinion below and will only be recited in this opinion where necessary to illuminate the legal issues. Appellant was the president of Trinicon, Inc., [Trinicon] a commercial contracting company. The theft charge arose when appellant purchased over ten thousand dollars worth of Mexican adobe tile on credit from Dal-Tile Corporation [Dal-Tile] and subsequently failed to pay for it, despite Dal-Tile's repeated attempts at collection. It was the State's theory that appellant induced Dal-Tile to sell him the tile on credit by promising to pay for it within thirty days from the date of the invoice for the sale (Dal-Tile's standard credit agreement), when, in fact, he never intended to pay for the tile at all. If the State's theory was factually correct, then appellant's conduct was denounced by our theft statute, V.T.C.A. Penal Code, § 31.03.[1]

---

1. Section 31.03(a) states:
 "A person commits an offense if he unlawfully appropriates property with the intent to deprive the owner of property."

 Section 31.03(b) states:
 "Appropriation of property is unlawful if: (a) it is without the owner's consent"
 Section 31.01(4) states:

It was uncontested at trial that appellant appropriated the Mexican adobe tile with intent to deprive Dal-Tile of it. The only issue in the case was whether appellant's appropriation was unlawful. This issue turned on his state of mind at the time he ordered the tile. If he did not intend to pay for the tile when he ordered it, his appropriation was accomplished by deception and was thus unlawful. *See* note 1, supra. Since § 31.01(2)(E), supra, specifically states that intent not to perform cannot be inferred from non-performance alone, it was incumbent upon the State to introduce "other evidence" on this issue to make a prima facia case against appellant.

The State's "other evidence" in this case consisted of the facts and circumstances surrounding appellant's transaction with Dal-Tile[2], and the testimony of thirty-five witnesses who testified to extraneous offenses[3] wherein there was sold, leased, or lent goods or services of value (including money) to appellant or Trinicon based on *appellant's*[4] unfulfilled promise to have Trinicon pay for those goods and services. It was the State's position at trial, and is on appeal, that appellant's repeated failure to fulfill his promises of payment constituted a scheme which was highly probative on the issue of his intent in the Dal-Tile transaction.

The court of appeals held that "[s]ome of these debts were admissible to show appellant's scheme and criminal intent yet many were not." 674 S.W.2d at 372. The court of appeals correctly held that the State was entitled to introduce other transactions involving appellant in its case-in-chief as circumstantial evidence of appellant's intent, since his intent could not be inferred from his act of non-payment alone. *Id.* at 373; *see* § 31.01(2)(E), supra; *see also Rogers v. State*, 598 S.W.2d 258 (Tex.Cr.App.1980); *Crawley v. State*, 513 S.W.2d 62 (Tex.Cr. App.1974); *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972). The court of appeals, after generally discussing the law of extraneous offenses, concluded:

> "For the evidence of these other transactions to have been admissible, they must have occurred within a reasonable time frame to the time of the offense for which he stood charged, and they must have shown a similarity of plan, scheme or design consistent with the acts of appellant in the crime charged, or a combination of these similar distinguishing characteristics. 674 S.W.2d at 373.

---

" 'Effective consent' includes consent by a person legally authorized to act for the owner. Consent is not effective if: (A) induced by deception or coercion."
Section 31.01(2) states:
" 'Deception' means: ... (E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed."

2. The State presented evidence that appellant told Dal-Tile the tile would be used on a job site that "circumstantially" did not exist; that at the time the tile was delivered, Trinicon had no outstanding jobs; that appellant tried to sell the tile through the want-ads for a price less than that he had contracted to pay; and that appellant told repeated untruths to Dal-Tile in response to its collection efforts.

3. These extraneous offenses were nothing more than extraneous business transactions in which appellant or Trinicon failed to pay for goods or services rendered. Since owing a debt does not, standing alone, constitute a penal offense, it may seem misleading to use the term "extraneous offense" in referring to the debts. This is probably why the court of appeals referred to the debts as "extraneous transactions" in its opinion. This terminology reflects the lesser prejudicial effect of non-criminal extraneous conduct, *see Crawley v. State*, 513 S.W.2d 62, 65 (Tex.Cr.App.1974), but should not be construed to imply a different standard for admissibility of the evidence. The analysis of the admissibility of extraneous conduct is the same whenever the extraneous conduct reflects adversely on the character of the defendant, regardless of whether that conduct might give rise to criminal liability. With this understanding, we shall use the "extraneous transaction" terminology employed by the court of appeals.

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

■ We believe that in applying this test for determining admissibility, the court of appeals failed to take into account the evidentiary purpose of the offer as well as the balancing test required in determining the admissibility of extraneous transactions. Recently, in *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983), we stated the true "test" of extraneous offense admissibility to be: "extraneous transactions constituting offenses shown to have been committed by the accused [note omitted] may become admissible upon a showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case; and the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." *Id.* at 346 [emphasis in original]. The factors of remoteness and similarity are important, not in and of themselves, but only as they bear on the relevancy and probative value of the offered extraneous offenses. Thus as correctly stated in the court of appeals opinion: "[i]f the State can prove that there are sufficient common distinguishing characteristics between the extraneous offense and the primary offense such that the probative value of the evidence outweighs its prejudicial value, then the court may admit the evidence to prove certain elements of the crime." 674 S.W.2d at 372.

■ As noted in *Williams, supra, ante,* the test of admissibility has two steps. First, it must be determined that the extraneous offense evidence is relevant to a material issue in the case other than the defendant's character.[5] Second, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect.

"Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable." *Waldrop v. State,* 138 Tex.Cr.R. 166, 133 S.W.2d 969, 970 (1940)[6]

Where the evidence sought to be introduced is an extraneous offense,

"its relevance is a function of its similarity to the offense charged. In this regard, however, similarity means more than that the extrinsic and charged offense have a common characteristic. For the purpose of determining relevancy, 'a fact is similar to another only when the common characteristic is the significant one for the purpose of the inquiry at hand.' Stone, *The Rule of Exclusion of Similar Fact Evidence: England,* 46 Harv.L.Rev. 954, 955 (1933). Therefore, similarity, and hence relevancy, is determined by the inquiry or issue to which the extrinsic offense is addressed." *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (En Banc).

■ Where the material issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extraneous offense derives purely from:

"the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of rea-

---

5. The material issue in this case being appellant's intent, which determined whether his appropriation was unlawful, and could not be inferred from his act of non-payment alone.

6. We do not perceive this definition as being any different from Tex.R.Evid. 401, which reads: " 'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determi-

nation of the action more probable or less probable than it would be without the evidence." It bears mentioning that both definitions encompass the concept of materiality ("a pertinent hypothesis," "the proposition at issue," and "any fact that is of consequence to the determination of the action"), as well as the concept of relevancy. *See* McCormick on Evidence, § 185 (3rd ed.1984).

soning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.

"...

"It will be seen that the peculiar feature of this process of proof is that the act itself is assumed to be done,—either because (as usually) it is conceded, or because the jury are [sic] instructed not to consider the evidence from this point view until they [sic] find the act to have been done and are proceeding to determine the intent. *This explains what is a marked feature in the rulings of the courts, namely, a disinclination to insist on any feature of common purpose or general scheme as a necessary requirement for the other acts evidentially used. It is not here necessary to look for a general scheme or to discover a united system in all the acts; the attempt is merely to discover the intent accompanying the act in question; and the prior doing of other acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand.*

"Yet, in order to satisfy this demand, it is at least necessary that prior acts should be *similar.* Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance....
In short, there must be a similarity in the various instances in order to give them probative value." [7] 2 Wigmore, *Evidence,* § 302 (Chadbourn rev.ed. 1979). [emphasis in original]. *Accord, Sewell v.*

*State,* 629 S.W.2d 42, 46 (Tex.Cr.App. 1982) (and cases cited therein); 2 Ray, *Texas Evidence,* § 1521 (3rd ed.1980); Comment, *The Admissibility of Other Crimes in Texas,* 50 Tex.L.Rev. 1409, 1416–17 (1972). *See also Garza v. State,* 632 S.W.2d 823 (Tex.App.—Dallas 1982, pet. granted).

In the case sub judice, a limiting instruction, *requested by appellant,* was included in the jury charge. This instruction limited the jury's consideration of appellant's extraneous debts to the issues of intent and scheme.

Our prior cases have permitted the admission of evidence of the existence of a scheme, plan, or design in theft prosecutions for the purpose of showing intent. *E.g., Mulchahey v. State,* 574 S.W.2d 112, 117 (Tex.Cr.App.1978); *Lasker v. State,* 573 S.W.2d 539, 543 (Tex.Cr.App.1978); *Hammonds v. State,* 500 S.W.2d 831, 832–33 (Tex.Cr.App.1973); *Grayson v. State,* 481 S.W.2d 859, 862 (Tex.Cr.App.1972). As stated in the court of appeals opinion: "[s]uch evidence can be admitted to show a common plan or scheme only if the offenses have common distinguishing characteristics which show that there was a common plan or scheme in both offenses." 674 S.W.2d at 368.

In *Grayson,* supra, we wrote that:

"extraneous offenses may be shown ... where such extraneous offenses have been executed according to a system or method, and it is shown that the accused committed other such offenses and, in so doing, followed the same plan or method as is shown to have been followed in the commission of the crime in the indictment." *Id.* at 862.

■ It appears to us that this standard is more stringent as regards "similarity" than is the standard for the admissibility of "intent" evidence. While none of our cases directly explicate this proposition, the com-

---

**7.** It is crucial to distinguish the use of extraneous offenses to prove issues other than intent. In other contexts different standards apply because the inference to be drawn from the extraneous offense is not based upon the reasoning applicable here. See *United States v. Beechum,* 582 F.2d 898, 911–12 n. 15 (5th Cir.1978) (En Banc).

mentators are in agreement that this is so. 2 Wigmore, supra, § 304; Imwinkelried, *Uncharged Misconduct Evidence,* §§ 3:20–23, 5:33 (1984). Furthermore, in the cases cited above, the extraneous offenses that were admitted were so similar as to constitute proof of modus operandi. Clearly, such a high degree of similarity is not required when the purpose of the proof is to show intent. We have only required such a high degree of similarity in our prior cases when identity was the issue at bar. *See, e.g., Dickey v. State,* 646 S.W.2d 232 (Tex.Cr.App.1983); *Cameron v. State,* 530 S.W.2d 841 (Tex.Cr.App.1975); *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App. 1974).

 We need not, however, decide whether appellant's extraneous transactions were admissible as evidence of "scheme" in this case because the record affirmatively reflects that appellant received the limiting instruction in the court's charge to the jury *that he requested.* Where evidence is admissible for a limited purpose only and the court admits the evidence without limitation, the party opposing the offer has the burden of requesting the correct limiting instruction. Since appellant got the instruction he requested, he is in no position to complain on appeal about the wording of the limiting instruction. *See Burns v. State,* 556 S.W.2d 270, 284 (Tex.Cr.App.1977); *Bryant v. State,* 471 S.W.2d 66, 67 (Tex.Cr.App.1971); 1 Ray, supra, § 21; *see also* Tex.R.Evid. 105(a). It was appellant's contention during trial that the extraneous debts were not admissible for any purpose. If he is correct, reversible error occurred in the trial court. If, however, the extraneous debts were admissible on the issue of intent, the trial court properly admitted the evidence. We now turn to the admissibility of the extraneous transactions to show appellant's intent.

 Our first inquiry is to determine the relevancy of appellant's extraneous debts. Do appellant's numerous instances of failing, after promising to pay for the sale, lease, or loan of goods or services of value make it more probable that he never intended to pay Dal-Tile? The answer, plainly, is yes. If a person repeatedly fails to pay for items purchased on credit, we believe the natural inference to be that he or she is seeking to obtain something for nothing. Other inferences may be drawn from this same pattern of conduct, such as unforeseen insolvency, or some strange mental ailment that provokes a spending binge. In this case, however, there is no evidence of bankruptcy or mental disease or defect. Since the extraneous debts are relevant if their presence makes appellant's criminal intent more likely than would be assumed in their absence, we believe they are all relevant.

Did the probative value of the evidence outweigh its prejudicial effect? Here, we are in agreement with the court of appeals that certain inadmissible transactions were improperly admitted. We do not, however, agree with the court of appeal's determination that "many" of the transactions were inadmissible because they were too dissimilar from the primary offense in the case *sub judice.* A careful reading of the opinion below shows that the extraneous transactions that were found to be admissible were those which occurred in a strictly business context, *i.e.,* similar credit transactions for which payment had never been received involving tile, carpet, tools, and newspaper ads offering those items for sale. Numerous transactions were found to be inadmissible simply because appellant purchased the goods for personal use as opposed to business use. We believe this distinction is meaningless for the purpose of the inquiry at hand. These extraneous debts involve all the same features as the business debts save the distinction pointed out by the court of appeals. All of the transactions mentioned in the opinion below except for those involving the Dallas Times Herald, Gary Groce, William Vastine, and the "ski shop owner," had in common the following factors: all were a sale of goods or services on credit induced by appellant's unfulfilled promise to later pay for the goods or services. Additional-

ly, in each instance, both in business and personal transactions, appellant had the seller bill Trinicon for the purchase, and he never voluntarily returned any of the merchandise.[8]

We believe the above similarities are sufficient to give the extraneous transactions detailed in the opinion below, except those involving the Dallas Times Herald, Gary Groce, William Vastine, and the "ski shop owner," equal probative value on the issue of appellant's *intent.* This is so because the probative value of these debts stems from the fact of nonpayment itself, which is the common characteristic that "is the significant one for the purpose of the inquiry at hand." Stone, supra, at 955. As we stated above, it is the repeated failure to pay in the other transactions that leads logically to the inference of lack of intent to pay in the instant case. Since the theory of relevancy in this instance derives from the doctrine of chances, the probative value of the evidence increases as the number of instances of nonpayment increases. Since the State's "other evidence", on the primary offense, of appellant's intent, *see* n. 2, supra, was somewhat ambiguous, circumstantial, and less than convincing beyond a reasonable doubt, we find that the extraneous transactions, except those specifically listed above, possess a high degree of probative value.

The prejudicial effect of extraneous offenses is well reported:

"In a criminal proceeding, when the State seeks admission of an extraneous or similar transaction committed by the accused which constitutes a separate criminal offense, introduction of that 'extraneous offense' transaction is inherently prejudicial, since the accused has no notice he will be called to defend against it, and his 'propensity to commit crimes' is not material to whether he is guilty of the specified conduct which is charged by the State...." *Williams v. State,* supra, at 346. (quoting *Elkins v. State,* 647 S.W.2d 663, 665 (Tex.Cr.App.1983).

In this case we find the prejudicial effect of the extraneous transactions is lessened by two factors. First, the extraneous transactions introduced in this case were not introduced as criminal offenses, nor did the State ever argue that these transactions constituted other thefts by deception. Instead the State merely argued the logical relevancy of appellant's other instances of nonpayment as indicating his lack of intent to pay in the primary case. The State did not attempt to brand appellant as a criminal in general. The non-criminal nature of the extraneous debts reduces their prejudicial effect. *See Crawley,* supra, at 65. Second, appellant requested and received an instruction limiting the jury's consideration of the evidence to what he perceived to be its proper purpose. This reduced the risk that the jury would misuse the evidence. Since the probative value of the evidence is quite high in this case and the prejudicial effect is, relatively speaking, minimal, we hold that all of the extraneous transactions, except those previously specified, and detailed in the court of appeal's opinion, were properly admitted.[9]

We now turn to the extraneous transactions which we find to have been inadmissible. One transaction, involving the Dallas Times Herald, was erroneously found to have been admissible by the court of appeals. This transaction was not inadmissible because it lacked the requisite similarities, but because there was not a "clear showing" that appellant participated in the extraneous transaction as required by *e.g., Nance v. State,* 647 S.W.2d 660, 662 (Tex. Cr.App.1983). The evidence merely showed that Trinicon had been involved in the transaction. Appellant's name did not appear on the newspaper's business

---

8. Several other personal transactions fitting this pattern are not detailed in the court of appeals opinion. Without reciting the details, which would add little to this opinion, we shall treat these transactions, with two exceptions, the same as we treat the personal transactions that are detailed in the opinion below.

9. This holding also applies to those transactions mentioned in note 8, supra.

records, Trinicon's did. Trinicon was shown at trial to have more employees than appellant himself. The records witness from the newspaper was unable to say who placed the ads in the newspaper. There is simply no evidence in the record that appellant authorized the ads in the Times Herald.

■ We agree with the court of appeals that the testimony of Gary Groce and William Vastine, both former business partners of appellant, was inadmissible. Groce's testimony did not involve the sale of a good or service, but instead involved a loan and a lease. Since the other thirty-three extraneous transactions involved the sale of goods or services, this dissimilarity made the probative value of Groce's testimony marginal at best. Additionally, appellant made a few payments on the jeep he leased from Groce, in contrast to the other transactions where appellant made no payments *after* receiving the good or service. The testimony of Vastine was nothing more than his opinion of appellant's character. It was non-specific and completely lacked any similarity to the Dal-Tile transaction. Of similar import was the testimony of Kathy Garcia, a former bookkeeper for appellant and Vastine. She testified that appellant became furious when she paid the company's bills. Her testimony amounted to nothing more than her opinion of appellant's character. The testimony of the "ski shop owner" was inadmissible, not because appellant made a down payment, but because it was remote, having occurred some thirty-five months prior to trial. All the other admissible transactions, save for two to be discussed next, took place within eighteen months of the time of appellant's trial in this cause. Due to this time gap, this transaction was too remote to show appellant's intent, especially when the number of admissible extraneous transactions was so high. *See Robledo v. State*, 480 S.W.2d 401 (Tex.Cr.App. 1972); *cf. Voelkel v. State*, 501 S.W.2d 313 (Tex.Cr.App.1973) (remote evidence that is part of "a continuous series of extraneous transactions" is admissible.)

■ We also find that two other transactions, not detailed by the court of appeals, were too remote to qualify for admission. One involved the sale of several fur coats to appellant on credit, for which he never paid. This transaction occurred four years prior to trial.[10] The other involved the sale of a VCR to appellant on credit, for which he never paid. This transaction occurred over three years prior to trial.

■ Having determined that seven out of thirty-five extraneous transaction witnesses should not have been permitted to testify as they did, we must now assess whether this error was harmful to appellant. If there is a reasonable possibility that the inadmissible evidence might have contributed to either the conviction or the punishment assessed, then the error was not harmless. *Maynard v. State*, 685 S.W.2d 60, 67 (Tex.Cr.App.1985). After carefully reviewing the entire record in this cause, we are unable to conclude that appellant was harmed by the introduction of the inadmissible extraneous transactions. With respect to its effect on the jury's determination of appellant's guilt, the high number of admissible transactions negate the possibility of harm. Since appellant received a sentence of only ten years confinement when the maximum sentence available was twenty years confinement, we do not believe that the jury assessed any extra punishment as a result of the inadmissible evidence. This is especially true when we consider the fact that the twenty-eight witnesses who testified properly, testified, in some cases, to more than one transaction involving appellant. Thus, the number of admissible transactions was actually far in excess of twenty-eight.

Accordingly, the judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

CLINTON and TEAGUE, JJ., concur in result.

---

**10.** We consider the fact that appellant made a down payment in this transaction to be of little weight, since the bulk of the purchase was on credit and appellant neither made any payments after obtaining the furs nor did he ever return the furs.