**Affirmed and Opinion Filed July 22, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00851-CR

### DESMOND RENARD FISHER, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F-1900024-Y**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Nowell
Opinion by Justice Partida-Kipness

Appellant Desmond Renard Fisher appeals his conviction of one count of sexual assault. In two appellate issues, Fisher seeks reversal and a new sentencing hearing due to charge error allegedly resulting in egregious harm. Alternatively, he contends the conviction should be reversed and remanded for a new trial due to the trial court's abuse of discretion in admitting extraneous offense evidence that affected his substantial rights. We overrule his appellate issues and affirm the judgment.

## PROCEDURAL HISTORY

Fisher was indicted on a charge of aggravated sexual assault. *See* TEX. PENAL CODE § 22.021(a)(1)(A). The indictment alleged that on or about August 20, 2017, Fisher intentionally and knowingly caused the contact of W.M.'s[1] sexual organ by his sexual organ without consent, and by acts and words, threatened to cause fear of death and serious bodily injury to W.M. and in her presence. Fisher pleaded not guilty, and the case went to trial in 2019. The jury found Fisher guilty of the lesser included offense of sexual assault. He was sentenced to twenty years' confinement and a $10,000 fine. Fisher's motion for new trial was overruled by operation of law. Fisher then timely filed a notice of appeal.

## BACKGROUND

In 2017, W.M. was homeless, engaged in prostitution to pay for drugs, and sleeping out in the open near East Ledbetter Drive in Dallas, Texas. On August 20, 2017, Fisher approached W.M. in a parking lot known for prostitution and asked her if she was trying to make some money. W.M. entered his pick-up truck and agreed to have vaginal sex for twenty dollars. They first drove to the Texaco station at Lancaster Road and East Ledbetter Drive for Fisher to buy a condom. Fisher then

---

[1] We refer to the complainant, W.M., by initials to protect her identity. TEX. R. APP. P. 9.8(a). The State presented evidence of three additional sexual assaults allegedly committed by Fisher. We will refer to the victims of those assaults by pseudonyms or first name to protect their identities. One such witness testified using the pseudonym Sally Barton. We will refer to her as Sally. We will refer to the other alleged victims, Q.B. and M.W., as Quassandra and Melanie.

drove W.M. to a secluded area just east of Lancaster Road and about a mile southeast of the Texaco. When they parked, W.M. exited the vehicle, proceeded to the rear of the vehicle, and began to unbutton her pants. According to W.M., Fisher emerged with a long-barrel revolver, pointed it at her, and "told [her] to shut up and let him do what he needed to do." She testified Fisher bent her over the back of the pick-up truck and had vaginal sex with her. W.M. answered "No" when asked "Do you know if he was wearing a condom or not?" She confirmed, however, that Fisher ejaculated in her vagina, and the assault lasted "about three, four minutes." According to W.M., she tried to enter the truck again, but she fell out when Fisher hit her on the side of the head. Fisher then got in his vehicle and left W.M. in the rural area. During the assault, W.M. noticed the truck was missing its rear tailgate. She was also able to memorize the license plate number.

After Fisher left, W.M. ran down the street and went door to door yelling for help. A responding homeowner testified W.M. was rattled and hysterical. The homeowner called the police. W.M. was transported to Methodist Hospital by ambulance. At the hospital, the sexual assault nurse examiner (SANE Nurse) collected an oral sample and four vaginal swabs from W.M. The vaginal swab collected from W.M. was later analyzed and compared to Fisher's DNA profile, which had been obtained from a buccal swab taken of Fisher by the Dallas Police Department. The DNA analyst testified that she identified two DNA contributors to the vaginal swab taken from W.M. The two contributors were W.M. and Fisher.

At the time of trial, three additional indictments for aggravated sexual assault were pending against Fisher. The complainants in those cases were Quassandra, Sally, and Melanie. Before trial, the State filed a notice of extraneous offenses and a trial brief in support of their admissibility. The offenses in the notice and brief included the alleged aggravated sexual assaults of Quassandra, Sally, Melanie, and four other women, the alleged sexual assault of an unknown woman, a 2017 DUI conviction, and six additional criminal acts. Fisher filed a written response objecting to admission of the evidence concerning sexual assaults against women other than W.M. Fisher also objected to admission of the evidence on the record during a pretrial hearing. The trial court overruled Fisher's objections to the testimony of Quassandra, Sally, and Melanie. Fisher challenges those rulings on appeal.

During the guilt-innocence phase of the trial, the State called Quassandra, Sally, and Melanie. Each woman testified she had been sexually assaulted. Several details of those attacks were similar to the details provided by W.M. of her sexual assault. For example, Quassandra, Sally, and Melanie each testified their assailant drove an old pick-up truck, used a weapon or physical force during the assault, vaginally penetrated her from behind while she was bent over the truck, and drove away and left her stranded after the assault. Further, the assailant picked each woman up within one mile of the Texaco station mentioned by W.M. He picked Quassandra up at a bus stop on East Ledbetter Drive about a mile east of Lancaster Road, met Sally next to the Texaco, and approached Melanie at Lancaster Road and Shellhorse

–4–

Drive. Each of these locations was south of East Ledbetter Drive, east of Lancaster Road, and west of Bonnie View Lane. Similarly, the location of each assault was in a secluded area less than two miles southeast of the Texaco. W.M. and Quassandra were assaulted near Johnson Lane and Ripple Road, Melanie was assaulted a few blocks east of there, and Sally was assaulted near Shellhorse Drive and Lancaster Road, which was less than one-and-a-half miles from the other crime scenes. Finally, Quassandra, Sally, and Melanie each testified that the assailant wore a condom for at least part of the sexual assault.[2] The evidence showed that DNA linked Fisher to each assault. Further, Melanie identified Fisher as her attacker in a photo lineup.

At trial, Fisher denied sexually assaulting any of the women. Fisher denied having sex with Melanie and testified that his sexual interactions with W.M., Quassandra, and Sally were consensual. He testified that he grew up in southeast Dallas and resided in an area near Ledbetter Road. According to Fisher, W.M. and Quassandra were prostitutes who consented to sex before receiving the money. He denied pulling a gun on either woman or causing them to fear for their lives. He admitted to taking off the condom during the sexual encounters and stated neither woman objected or asked him to stop. Fisher claimed Quassandra consented to his request for oral sex. He also admitted to driving off afterward so he would not have

---

[2] At trial, W.M. could not recall if Fisher wore a condom during the assault. She did, however, remember that he ejaculated in her vagina.

to pay Quassandra. W.M. and Quassandra denied giving him consent and testified that he threatened them with a weapon during the assaults.

As for his encounter with Sally, Fisher admitted she was not a prostitute and did not agree to have sex in exchange for money. He testified that he and Sally had consensual sex after spending the afternoon drinking in the park and in his vehicle. According to Fisher, he did not use a condom, and he drove her back to the Texaco after having sex. Sally testified Fisher used a condom when he vaginally penetrated her from behind, but after she fell to the ground he removed the condom and continued raping her. She also testified that Fisher drove away after the assault, leaving her stranded.

Fisher denied having sex with Melanie. According to Fisher, he saw Melanie on Lancaster Road near the Texaco station. He was in his vehicle and pulled over to talk with Melanie. He asked her if she was "trying to make some money," and she said yes. Melanie got in Fisher's vehicle and asked him if he would drive her to her sister's house "after we're done." According to Fisher, they agreed to have sex but had not agreed on the price when she got in the vehicle. Fisher drove them to a wooded area between his neighborhood and the neighborhood where Melanie's sister lived. He testified that after he parked in the wooded area, he refused to have sex with Melanie because she smelled like PCP and seemed high. Fisher claimed he physically removed Melanie from his vehicle after he repeatedly asked her to exit and she refused. He admitted he drove off and left Melanie behind.

After the jury found Fisher guilty of the lesser-included offense of sexual assault, trial proceeded to the punishment phase. The State called three witnesses. First, the State called Officer Steven Adler, the officer who arrested Fisher for driving while intoxicated in 2017. Adler testified that Fisher pleaded guilty to the DWI charge. The State then called Investigator Jonathan Wakefield with the Dallas County District Attorney's Office. Wakefield investigated the sexual assaults of W.M. and Quassandra. He testified the offenses had a similar *modus operandi* in both the type of victim and the location where the victims were first encountered and later sexually assaulted.

The State's final witness was Sherica Simmons, Fisher's former girlfriend. According to Simmons, over the course of their relationship, Fisher began to drink alcohol daily and the relationship became physically abusive. Simmons recalled two domestic violence incidents that occurred during the relationship. The State presented jurors with photos taken by police that showed the property damage, blood on the floor, and Simmons' injuries from the altercation. During Fisher's cross-examination of Simmons, she admitted their fights involved mutual physical violence and testified she would support a jury decision to sentence Fisher to probation.

After both parties closed, the State and the Defense reviewed the trial court's charge on punishment. Neither side objected to the charge. The punishment charge did not include an instruction that the jury could only consider extraneous offenses

if the State proved beyond a reasonable doubt that Fisher committed the offenses. The jury sentenced Fisher to twenty years' confinement and a $10,000 fine.

## ANALYSIS

Fisher brings two issues on appeal. First, he asserts the trial court erred by failing to instruct the jury regarding the State's burden of proof when presenting extraneous offenses during the punishment phase. Second, he maintains the trial court improperly admitted evidence of the allegations of sexual assault made by Quassandra, Sally, and Melanie. We will address each issue in turn.

## I. Charge Error

In his first issue, Fisher contends the judgment should be reversed due to the trial court's failure to instruct the jury during the punishment phase that the State must prove extraneous offenses beyond a reasonable doubt. He argues that the charge caused him egregious harm by depriving him of a fair and impartial trial. The extraneous offense evidence Fisher takes issue with here came from Simmons, his former girlfriend,

Jury charge error requires reversal when the defendant has properly objected to the charge, and we find "some harm" to his rights. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (internal citations omitted). Thus, we review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Id.* When the defendant fails to object or states that he has no objection to the charge, however,

we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Id.* Here, Fisher did not object to the jury charge on this basis at trial or request a reasonable doubt instruction as to the extraneous offenses. As such, if we conclude charge error occurred, then we review that error for egregious harm.

## A.    Existence of Error

A party may introduce evidence of "an extraneous crime or bad act" if the court deems such evidence relevant to sentencing and the crime or act "is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1); *see Huizar v. State*, 12 S.W.3d 479, 481 (Tex. Crim. App. 2000) ("such evidence may not be considered in assessing punishment until the fact-finder is satisfied beyond a reasonable doubt.") (quoting *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999)). The trial court has the responsibility to provide a reasonable-doubt instruction *sua sponte*. *See Huizar*, 12 S.W.3d at 483–84.

Here, the record shows the punishment-phase jury charge did not contain instructions regarding the State's burden of proof as to extraneous offense evidence. The State agrees with Fisher that the omission constituted jury charge error. We agree and conclude the charge was erroneous because it did not include a reasonable doubt instruction as to the extraneous offense evidence.

## B.      Egregious Harm

Having found charge error, we next analyze whether the error caused Fisher to suffer egregious harm. "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Actual harm is established when the erroneous jury instruction affected "the very basis of the case," "deprive[d] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)).

"An appellate court should examine four factors to determine whether an appellant was egregiously harmed by an erroneous jury instruction." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). Those factors are (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) the parties' arguments; and (4) all other relevant information in the record. *Id.* This analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013). Examining those factors, we conclude Fisher was not egregiously harmed.

### 1.      The entire jury charge.

First, we consider the entire jury charge. The punishment charge did not include an instruction about the State's burden of proof regarding extraneous offense evidence. The charge did, however, incorporate the charge given at the guilt-innocence stage:

> You are instructed that in assessing the defendant's punishment, which you will show in your verdict, you may take into consideration all the facts shown by the evidence submitted before you in the full trial of this case and **the law as submitted to you in this charge and the charge heretofore given to you by the Court herein.**

The State maintains that the guilt-innocence charge included the required reasonable doubt instruction concerning the extraneous offenses and the instruction was sufficient to protect Fisher's rights to a fair and impartial trial. According to the State, nothing suggests "the jury would not assume that the law remained the same for any extraneous offense evidence introduced in the punishment phase of the trial." We agree with the State in part.

The trial court's guilt-innocence charge included an instruction to the jury that any extraneous offenses had to be proved beyond a reasonable doubt. The jury was, therefore, properly alerted to not consider the extraneous evidence presented during that phase of trial unless they believed it beyond a reasonable doubt. *See Graves v. State*, 310 S.W.3d 924, 930–31 (Tex. App.—Beaumont 2010, pet. ref'd). The testimony of Quassandra, Sally, and Melanie concerning Fisher's unadjudicated extraneous sexual acts was clear, direct, and unimpeached. The jury could have reasonably believed that evidence beyond a reasonable doubt. *See id.*; *see also Zarco v. State*, 210 S.W.3d 816, 824–26 (Tex. App.—Houston [14th Dist.] 2006, no pet.). When the testimony of Quassandra, Sally, and Melanie was referenced again during the punishment phase, the jury had already undergone its reasonable doubt analysis of that evidence. *See Graves*, 310 S.W.3d at 930. We cannot infer that the inclusion

of a beyond-a-reasonable-doubt instruction in the court's punishment charge regarding those extraneous offenses would have changed how the jury considered that specific evidence. *See id.* (no egregious harm where extraneous offense evidence was the same during both phases of trial and jury was properly instructed during guilt-innocence phase); *see also Zarco*, 210 S.W.3d at 824–26 (same).

However, the same is not true regarding Simmons' testimony. Here, Fisher's appellate complaint focuses on new extraneous offense evidence presented to the jury for the first time during the punishment phase of the trial. Simmons did not testify during the guilt-innocence phase, and the alleged offenses against her were not sexual in nature. Rather, she told the jury of verbal and non-sexual, physical attacks by Fisher. Unlike the juries in *Graves* and the other cases cited by the State, the jury in this case had not undertaken a reasonable doubt evaluation of Simmons' testimony when they received the punishment charge. *Cf.*, Graves, 310 S.W.3d at 930; *Zarco*, 210 S.W.3d at 824–26; *Samsom v. State*, 292 S.W.3d 112, 132–34 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *Mock v. State*, 848 S.W.2d 215, 224 (Tex. App.—El Paso 1992, pet. ref'd). As such, we cannot conclude that the jury applied the extraneous offense instruction from the guilt-innocence charge to Simmons' testimony during the punishment phase. The first factor, therefore, weighs slightly in favor of egregious harm.

### 2. The state of the evidence.

Next, we evaluate the state of the evidence. In determining whether the charge error caused actual harm, we consider whether the extraneous evidence during the punishment phase was "clear, strong, direct and unimpeached" such that the jury charge "would not have made a difference in how the jury considered the evidence." *Martinez v. State*, 313 S.W.3d 358, 368 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). The entire record is considered in the analysis. *Arrington*, 451 S.W.3d at 841. According to Fisher, he suffered egregious harm because Simmons' testimony during the punishment phase related to alleged physical assaults of someone he knew, rather than alleged sexual assaults of strangers. We find this argument unconvincing.

Fisher did not impeach any of the State's evidence presented at sentencing. Although Fisher elicited testimony from Simmons to show she acted violently toward Fisher on two occasions, her testimony concerning his alcohol use and violent acts during their relationship "was clear, strong, direct and unimpeached" such that the jury charge "would not have made a difference in how the jury considered the evidence." *See Martinez*, 313 S.W.3d at 368.

Considering the "clear, strong, direct and unimpeached" testimony presented by the State's witnesses during the sentencing phase, we conclude it is unlikely an extraneous offense instruction would have changed how the jury considered the evidence. *See Martinez*, 313 S.W.3d at 368. It is, therefore, less likely that the jury

charge error caused appellant actual harm. *See Cosio*, 353 S.W.3d at 778. Given the record, we conclude the second factor does not weight in favor of finding egregious harm.

### 3. The parties' arguments.

We next consider whether either parties' arguments during the trial "exacerbated or ameliorated error in the charge." *Arrington*, 451 S.W.3d at 844. Here, the record shows neither party referenced nor misstated the State's burden of proof regarding the extraneous evidence. It was merely omitted. We disagree with Fisher's characterization that the State's argument discussed the extraneous evidence and then requested the maximum sentencing. On the contrary, the State argued that W.M.'s singular assault warranted the maximum sentence and referenced Simmons' testimony and the unadjudicated sexual assaults against Quassandra, Sally, and Melanie as secondary considerations. The State's reference to Simmons' testimony was part of a "general theme" of Fisher's "path of destruction." *See Martinez*, 313 S.W.3d at 368–69 (inclusion of the extraneous evidence as part of a general theme of the appellant's character did not weigh in favor of finding egregious harm).

Fisher's closing argument focused on seeking probation and, like the appellant in *Martinez*, failed to "mount any serious challenge to the extraneous offenses." *Id.* at 369. Fisher did not refute Simmons' testimony and made no reference to the State's evidence presented during the trial.

Given that the record reflects the State's closing argument prioritized W.M.'s assault, and only generally referenced the extraneous offense evidence and Fisher's failure to rebut it, we conclude it is unlikely the State's or Fisher's arguments exacerbated the charge error. The third factor does not weigh in favor of finding egregious harm.

### 4.    Other relevant information.

Fisher raises no other relevant information for our review. He does, however, contend he suffered egregious harm because the jury sentenced him to the maximum fine and length of incarceration. The severity of the sentence is not a controlling factor in the assessment of egregious harm for a charge error, but a court may consider it in some situations. *See Bolden v. State,* 73 S.W.3d 428, 432 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). While Fisher's sentence was the maximum, it was within the statutory sentencing range. A maximum sentence does not support a finding of egregious harm where, as here, the sentence is supported by the record. *See Martinez,* 313 S.W.3d at 369.

Here, the State presented to the jury that W.M.'s singular charge alone warranted the maximum sentence. The jury was presented evidence of three additional sexual assaults by Fisher during the guilt-innocence phase of the trial. Finally, the jurors heard the maximum sentence was necessary to protect the community from Fisher. Nothing in the record indicates the jury would have

returned a lesser verdict but for the omission of the jury charge. Under this record, we conclude the fourth factor does not weigh in favor of finding egregious harm.

### 5. No egregious harm shown.

The only factor that weighs in favor of finding egregious harm is the consideration of the jury charge. After considering and weighing all of the relevant factors, we conclude that the omission of a reasonable doubt instruction concerning extraneous offense evidence at punishment did not cause Fisher actual harm or deprive him of a valuable right. *See Cosio*, 353 S.W.3d at 777–78 (no egregious harm even though jury instructions weighed in favor of finding egregious harm). We overrule Fisher's first issue.

## II. Admission of extraneous offense evidence

In Fisher's second issue, he argues the trial court abused its discretion by admitting evidence of three other sexual assaults during the guilt-innocence phase. Fisher maintains admission of the extraneous offense evidence violated Rules 404(b) and 403 of the Texas Rules of Evidence.

A trial court's admission of extraneous offense evidence will not be reversed without a clear abuse of discretion. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). The appellate court will not reverse the trial court's evidentiary ruling admitting extraneous offense evidence if the ruling falls within the zone of reasonable disagreement. *Id.* The trial court's ruling must be upheld if the ruling was correct under any theory of law applicable to the case. *Page v. State,* 213 S.W.3d

–16–

332, 337 (Tex. Crim. App. 2006). The reviewing court shall not substitute its own opinion for that of the trial court. *Moses v. State,* 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Admission of evidence of crimes, wrongs, or other acts is generally prohibited if it is meant to prove the accused acted in conformity with his or her character. TEX. R. EVID. 404(b)(1). To be admissible, extraneous offense evidence must be "relevant apart from indicating mere character conformity" and "must tend to establish some elemental or evidentiary fact or rebut some defensive theory." *Brown v. State*, 96 S.W.3d 508, 511 (Tex. App.—Austin 2002, no pet.). For example, extraneous offense evidence may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b)(2). The proponent of the extraneous offenses must establish relevance apart from its character conformity value. *Santellan*, 939 S.W.2d at 168. Evidence that has "any tendency to make the existence of a material fact more or less probable" than it would be without the evidence is relevant. TEX. R. EVID. 401. Here, Fisher argues that the trial court abused its discretion by admitting extraneous offense evidence of the alleged sexual assaults of Sally, Quassandra, and Melanie.

The record reflects that the State, as the proponent of the extraneous offenses, maintained in the trial court that the additional sexual assaults were relevant regarding Fisher's identity, his *modus operandi*, and to rebut Fisher's consent defense. On appeal, the State maintains the evidence was admissible to rebut Fisher's

–17–

consent defense and as evidence of *modus operandi*. Fisher contends these arguments fail because he did not raise a consent defense during the State's case-in-chief, and the allegations made by Quassandra, Sally, and Melanie are not sufficiently similar to W.M.'s allegations to be considered evidence of *modus operandi*. We agree with the State.

Extraneous-offense evidence may be admissible to rebut a defensive theory that negates one of the elements of the offense. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). The victim's lack of consent is an element of the offense of aggravated sexual assault. TEX. PENAL CODE § 22.021(a). When a defendant raises the defensive theory of consent in a prosecution for sexual assault or aggravated sexual assault, he necessarily disputes his intent to engage in the alleged conduct without the victim's consent and thereby places his intent in issue. *Martin v. State*, 173 S.W.3d 463, 467 n.1 (Tex. Crim. App. 2005); *Rubio v. State*, 607 S.W.2d 498, 500–01 (Tex. Crim. App. 1980); *Wiggins v. State*, 778 S.W.2d 877, 884–85 (Tex. App.—Dallas 1989, pet. ref'd). A defendant can raise a defensive theory and open the door to admission of extraneous offense evidence during his opening statement, his cross-examination of the State's witnesses, or through evidence admitted in his case-in-chief. *De La Paz*, 279 S.W.3d at 344–45; *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994).

Here, the record shows Fisher raised a consent defense during his cross-examination of W.M. and the State's other witnesses. During his cross-examination

of W.M., Fisher's counsel suggested that W.M. engaged in consensual sexual intercourse with Fisher in exchange for money and denied consenting only after Fisher refused to pay her. By doing so, Fisher placed his intent at issue and opened the door for the State to rebut the consent defense. *See Brown*, 96 S.W.3d at 511 (defendant raised consent defense through cross-examination of the State's witnesses).

"When the defendant's intent to commit the offense charged is at issue, the relevance of an extraneous offense derives from the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." *Brown*, 96 S.W.3d at 512. "An unusual or abnormal element might be present in one instance, but the more often it occurs the less likely it is to be the true explanation." *Id.* To apply, however, "there must be a similarity between the charged and extraneous offenses, since it is the improbability of a like result being repeated by mere chance that gives the extraneous offense probative weight." *Id.* (citing *Plante v. State*, 692 S.W.2d 487, 492 (Tex. Crim. App. 1985)). The degree of similarity required to show intent, however, is less than what is required when the extraneous offense is offered to prove *modus operandi*. *Id.* at 512–13.

For example, in *Brown*, the State offered evidence of three extraneous offenses in which the victims all described similar encounters with the defendant.

–19–

*Id.* at 513. The defendant picked up the women in similar neighborhoods, took them to remote areas, sexually assaulted them, and left them stranded with little or no clothing. *Id.* There were also similarities in the women's lifestyles that suggested they were specifically selected as victims. *Id.* The appellate court held that the trial court properly exercised its discretion in admitting the evidence because the court "could reasonably have concluded that testimony by one of the other women tended to make the existence of [Brown's] guilty intent more likely than it otherwise would have been." *Id.* The same analysis applies here.

Here, as in *Brown*, lack of consent was an element of the charged offense and was disputed at trial. Fisher raised a consent defense and opened the door to admission of evidence concerning his intent by suggesting to W.M. during cross-examination that she consented to intercourse with Fisher. By raising the defensive theory of consent, Fisher necessarily placed his intent to commit the alleged conduct without W.M.'s consent in issue. *See Brown*, 96 S.W.3d at 513. And, like *Brown*, the State offered evidence of three extraneous offenses in which the victims all described similar encounters with the defendant. *See id.* Here, the record shows that Fisher picked up the women in the same neighborhood, took them to remote areas within that neighborhood, sexually assaulted them from behind while bending the women over his pick-up truck, and left them stranded after the assault. Although there were some dissimilarities between the charged and extraneous offenses with respect to the exact location of the assaults and whether the victims were prostitutes

seeking money for sex, "these differences do not significantly lessen the relevance of the extraneous acts with respect to the issue of [Fisher's] culpable mental state." *See id.* Under this record, we conclude the extraneous offense evidence was relevant to Fisher's intent, and the trial court did not abuse its discretion by admitting the evidence.

Further, the record reflects that the extraneous offenses were sufficiently similar to the charged offense to qualify as *modus operandi* evidence. A defendant's *modus operandi* is his "distinctive and idiosyncratic manner of committing criminal acts." *Casey v. State*, 215 S.W.3d 870, 880–81 (Tex. Crim. App. 2007). *Modus operandi* is an exception to the general rule excluding extraneous-offense evidence if the *modus operandi* tends to prove a material fact at issue, other than propensity. *Id.* Evidence of a remarkably similar act may be admissible to prove lack of consent, intent, identity, or the corpus delicti (the crime itself). *See, e.g., id.*; *Martin*, 173 S.W.3d at 467–68; *Daggett v. State*, 187 S.W.3d 444, 452, n.18 (Tex. Crim. App. 2005); *Plante*, 692 S.W.2d at 491–92. While some similarity between the extraneous and charged offenses is required for the extraneous-offense evidence to be admissible under this theory, an extremely high degree of similarity is not required where intent or lack of consent, as opposed to identity, is the material issue. *See Plante*, 692 S.W.2d at 493; *Brown*, 96 S.W.3d at 513 (Tex. App.—Austin 2002, no pet.); *Wiggins*, 778 S.W.2d at 886. Such similarities are present here.

Fisher met the women in the same neighborhood, took them to a secluded area, drove a pick-up truck, left them stranded after the assault, and the assaults occurred in close proximity to each other in South Dallas. Further, DNA linked Fisher to all of the women. The assaults were also similar in how they were performed in that Fisher penetrated each woman vaginally from behind while bending the woman over either the tailgate or hood of the pick-up truck. Given the numerous similarities between the charged and extraneous offenses, the trial court could have reasonably concluded that the extraneous-offense evidence tended to make the existence of W.M.'s lack of consent, as well as the existence of Fisher's intent to engage in the charged conduct without her consent, more probable than they otherwise would have been. *See Martin*, 173 S.W.3d at 468; *Brown*, 96 S.W.3d at 513. Fisher's reference to minor distinctions between W.M.'s offense and the three extraneous offenses does not weaken the relevance of the evidence to the issues of Fisher's culpable mental state or the lack of the women's consent. *See Wiggins*, 778 S.W.2d at 886 (explaining that an extremely high degree of similarity between the charged offense and extraneous offense is not required when intent, rather than identity, is the material issue). The trial court therefore properly exercised its discretion under Rule 404(b) in admitting the evidence of the extraneous offenses involving Quassandra, Sally, and Melanie.

Once the trial judge has ruled on whether the evidence is relevant beyond its character conformity value, the judge has ruled on the full extent of the Rule 404(b)

objection. *Montgomery*, 810 S.W.2d at 388. The opponent must then make a further objection based on Rule 403 in order for the trial judge to weigh the probative and prejudicial value of the evidence. *Id.*; *Santellan*, 939 S.W.2d at 169. On appeal, Fisher contends the extraneous offense evidence of the three additional sexual assaults should have been excluded under Rule 403 because its probative value substantially outweighed the danger of unfair prejudice. Fisher, however, did not assert a Rule 403 objection in the trial court. He, therefore, failed to preserve this issue for appellate review. TEX. R. APP. P. 33.1. As a result, we do not address Fisher's Rule 403 arguments.

Under this record, we conclude the trial court did not abuse its discretion by admitting the testimony of Quassandra, Sally, and Melanie. Finding no error, we overrule Fisher's second issue without conducting a Rule 44.2(b) harm analysis.

## CONCLUSION

For these reasons, we conclude Fisher failed to show egregious harm due to charge error and did not prove the trial court abused its discretion by admitting extraneous offense evidence concerning three adjudicated sexual assaults. Accordingly, we overrule Fisher's appellate issues and affirm the trial court's judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

190851f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)

–23–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DESMOND RENARD FISHER,
Appellant

No. 05-19-00851-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 7, Dallas County, Texas
Trial Court Cause No. F-1900024-Y.
Opinion delivered by Justice Partida-Kipness. Justices Pedersen, III and
Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 22nd day of July 2022.